UNITED STATES of America, ex rel.
Dan GRAVES and Susan
Newman, Plaintiffs,

v.

ITT EDUCATIONAL SERVICES, INC.,
Pricewaterhouse Coopers LLP, and
Rene R. Champagne, Defendants.

No. CIV.A. H–99–3889.

United States District Court,
S.D. Texas,
Houston Division.

March 31, 2003.

Michelle Zingaro, Office of U S Attorney, Houston, TX, Michael F Hertz, Dept of Justice, Civ Div, Washington, DC, for United States of America.

Scott D Levy, Attorney at Law, Houston, TX, for Dan Graves, Susan Newman.

Larry L Huelbig, Haynes & Boone, Houston, TX, Timothy J Hatch, Gibson Dunn et al, Grant E Kinsel, Gibson Dunn & Crutcher, LLP, Los Angeles, CA, for ITT Educational Services Inc.

Michael Kyle Swan, Akin Gump et al, Ann M Hebert, Akin Gump et al, Houston, TX, John C Millian, Gibson Dunn et al, David W T Daniels, Gibson Dunn et al, Washington, DC, for Pricewaterhouse, Coopers LLP.

Larry L Huelbig, Haynes & Boone, Houston, TX, Timothy J Hatch, Gibson Dunn et al, Los Angeles, CA, for Rene R Champagne.

## MEMORANDUM AND ORDER

ROSENTHAL, District Judge.

This is a False Claims Act case. Relators, Dan Graves and Susan Newman, sued ITT Educational Services, Inc., which owns and operates approximately seventy technical colleges around the country; its chairman, Rene R. Champagne (together, "ITT"); and its outside auditor, Pricewaterhouse Coopers LLP ("PwC"). ITT participated in federal student financial aid programs under Title IV of the Higher Education Act of 1965, ("Title IV, HEA"), 20 U.S.C. § 1078, *et seq.* Under these programs, the United States Government insured educational loans and made direct educational grants to students enrolled at ITT. Title IV, part G, § 487(a)(20) of the HEA prohibits participating educational institutions such as ITT from making commission or incentive payments to admissions or recruitment personnel based on success in securing enrollments or financial aid to students. Relators allege that ITT and Champagne falsely promised that ITT would comply and certified that ITT had complied with this regulation. Relators also allege that in its audits of ITT, PwC made false statements as to ITT's attestations of compliance and as to whether ITT's financial statements fairly represented its financial condition.

This court dismissed Relators' first amended complaint, finding that it failed to state a claim under the False Claims Act, ("FCA"), 31 U.S.C. § 3729, *et seq.*, but allowing leave to amend. (Docket Entry No. 64). Relators filed a second amended complaint. (Docket Entry No. 65). Both ITT and PwC have moved to dismiss under Rule 12(b)(6), for failure to state a claim on which relief can be granted. PwC has also moved to dismiss under Rule 9(b), for failure to allege fraud with particularity. (Docket Entry Nos. 73, 74). Relators have responded. (Docket Entry Nos. 82, 83).

Based on the pleadings, the motions and responses, the parties' submissions, and the applicable law, this court GRANTS the motion to dismiss filed by ITT and Champagne, with prejudice, and GRANTS the motion to dismiss filed by PwC, with prejudice. The reasons for these rulings are explained below.

## I. Background

ITT is a publicly traded corporation that owns sixty-eight post-secondary technical schools in the United States. (Docket Entry No. 65, ¶ 13). Rene R. Champagne is the chairman, president, chief executive officer, and a director of ITT. (*Id.* at ¶ 6). Relators Dan Graves and Susan Newman were admissions/recruitment representatives at the Santa Clara, California ITT campus. Newman began working in 1998; Graves in 1999. Both were employed until February 2000. (*Id.* at ¶¶ 2–3).

ITT employed two categories of admissions/recruitment representatives. ITT had approximately two hundred and fifty-five "inside" representatives who worked in student recruitment offices located on ITT campuses. ITT also had approximately two hundred and fifty-five "outside" representatives who visited high school seniors and other prospective students. (*Id.* at ¶ 58). Relators allege that from 1993 to the present, all of ITT's campuses paid its admissions/recruitment representatives under an "incentive salary structure" providing for the payment of "5% of earned revenues for Inside Representatives and 10% of earned revenues for Outside Representatives." (*Id.* at ¶ 56). Relators allege that because the "level of 'earned revenue' was a direct function of the new and continuing students and graduates who are enrolled by the admissions and recruitment representative," the salary program was "an incentive salary structure that violated federal statute." (*Id.*). Defendants assert that they paid salaries to admissions and recruitment personnel that complied with the regulatory requirement of avoiding bonuses based on the number of students enrolled or the amount of financial aid obtained. This court does not, of course, address this dispute in this motion to dismiss.

Relators allege that ITT made "claims for payment" to the federal government through its participation in programs that enabled it to receive Title IV, HEA funds. These funds included federally guaranteed student loan funds administered under the Federal Family Education Loan Program ("FFELP"), the Federal Pell Grant Program, and the Federal Direct Student Loan Program. Under the FFELP, banks make loans to eligible borrowers, who are students enrolled at post-secondary schools approved to participate in Title IV, HEA programs. The student applies and the school certifies the student's eligibility. The application is submitted to the lender, which is usually a bank, and to a guaranty agency, which is usually a state agency or nonprofit organization. The funds are issued to the student and school jointly and the school disburses the funds to the student to use for tuition payments. If a student defaults in repayment, the guaranty agency reimburses the lender. If the agency is unable to collect, the Department of Education reimburses the guaranty agency.

The Pell Grants are direct grants of student financial aid. A student at a participating school applies for a Pell Grant. If the school finds that the student meets the eligibility requirements, it approves the application. The school asks the Department of Education for funds to pay the grant to the student. The request is made electronically to a federal Pell Grant Account maintained at the school. The Department of Education makes electronic fund transfers to a designated account for the school, which must hold the funds in trust for the Department and the designated student beneficiary until disbursed, which much be accomplished in three days.

Relators allege that from 1993 to 1999, ITT submitted applications for, and accepted, financial aid for students enrolled on its campuses under both the FFELP and the Pell Grant Program. Relators do not allege that the applications themselves

were false, in that they contained false information as to the students' eligibility or the purpose for the funds. Nor do Relators contend that the funds were not disbursed to the students to be used as stated or that educational services were not provided as represented. Rather, Relators contend that because ITT received student financial aid funds while ITT was "in violation of the incentive compensation prohibition" of Title IV, § 487, ITT "knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval," in violation of 31 U.S.C. §§ 3729(a)(1), (a)(2), and (a)(7). As to PwC, Relators contend that it failed properly to perform its outside auditor functions in the compliance examination of ITT and in the review of ITT's financial statements. Relators contend that PwC's compliance reports and reports on PwC's financial statements were false statements issued in support of ITT's improper receipt of government funds.

This court dismissed the first amended complaint, identifying a number of pleading deficiencies. This court found that the Relators did not detail how or when ITT made claims upon the government. This court also found that Relators did not plead facts that, if proven, would show that ITT and PwC made false statements or certifications. The second amended complaint adds considerable detail to the allegations as to how Title IV, HEA funds are disbursed through post-secondary schools to students under both guaranteed loan programs and direct grants. Relators argue that the second amended complaint alleges sufficient facts that, if proven, would show that ITT falsely certified its compliance with the prohibition against incentive compensation paid to recruiters and admissions personnel and fraudulently induced the government to pay funds under the Title IV, HEA programs by promising to comply with this regulation. Relators allege that by receiving student financial aid funds knowing it had failed to comply with the Title IV, § 487 requirement prohibiting incentive compensation payments to admissions officers or recruiters based on the number of students enrolled or the amount of amount of student financial assistance obtained, ITT made false claims for government payment. Relators also allege that PwC made false statements or certifications that were used in connection with the submission of ITT's false claims to the government.

The second amended complaint alleges the following as the false statements or certifications:

- The Program Participation Agreements (PPA) that ITT executed for each of its campuses contained statements by ITT promising future compliance with Title IV, HEA Program regulations and the terms of the PPA. The regulations included the incentive compensation prohibition.

- As part of the annual compliance audit, ITT managers executed management assertion letters to PwC. These letters confirmed to PwC that the school had, in the reporting period, complied with the requirements of Title IV, which included the incentive compensation prohibition.

- PwC issued an opinion letter as outside auditor for ITT, reporting on ITT's compliance with Title IV, HEA Program requirement, that failed to disclose the violation of the incentive compensation prohibition.

- PwC issued unqualified opinions on ITT's financial statements as part of the audits, which were false representations that PwC had audited ITT's financial statements in accordance with GAAS and that the financial statements were fairly presented in accordance with GAAP. Relators contend that the audit opinions should

have included a qualified or adverse opinion on the financial statements as a result of ITT's failure to meet the Title IV eligibility requirement of avoiding incentive compensation, which threatened ITT's viability.

- Relators also alleged, upon information and belief, a fifth statement by ITT, falsely certifying ITT's compliance with Title IV requirements, contained in Agency Forms 272 that ITT submitted to the government.[1]

(Docket Entry No. 65).

Relators referred to, but did not attach, a copy of a PPA to the first amended complaint. ITT submitted a standard form PPA. (Docket Entry No. 43, Ex. 2). Similarly, Relators did not quote or submit a copy of a ITT Management Attestation Letter to PwC, a copy of a Compliance Audit Report Opinion from PwC to the ITT board of directors, or a copy of a financial audit report opinion from PwC to ITT's board of directors. ITT and PwC have attached these documents to their submissions. (Docket Entry No. 73, Ex. A–E). Relators have not challenged the contents of any of these documents.[2]

Relators allege that ITT and PwC violated section 3729(a)(1) of the FCA, by knowingly presenting a false claim for payments from the United States government; section 3729(a)(2), by knowingly making a false statement to get a false or fraudulent claim paid or approved by the government; section 3729(a)(3), by conspiring to present false claims to the government; and section 3729(a)(7), by making or using a false statement to conceal or decrease an obligation to pay money to the government. Relators also allege that ITT terminated Susan Newman's employment in retaliation for reporting ITT's violations to the United States, in violation of section 3730(h), the antiretaliation provision of the FCA. Relators seek a judgment in the amount of three times the damages the United States sustained, a civil penalty of $5,000 to $10,000 for each violation, reasonable attorney fees, costs, and prejudgment interest. (*Id.* at ¶ 113). Because the United States has decided against intervention, Relators seek an award of between twenty-five and thirty percent of the proceeds. (*Id.*).[3]

---

1. Relators did not quote, attach, or describe the contents of Agency Form 272. The allegations as to this form are insufficient to provide a basis for a cause of action under the FCA.

2. Relators objected to defendants' requests to take judicial notice of the ITT and PwC documents that are referred to in the second amended complaint, including the ITT management attestation reports, the PwC audit reports on ITT's financial statements, and the PwC compliance report. (Docket Entry Nos. 85, 100). Relators argued that the documents were incomplete and in particular argued that PwC must also include its internal control reports for the company. PwC, while denying that this step is necessary on completeness grounds, supplied the internal control reports. (Docket Entry No. 103, Ex. A–E). The objection is denied.

Relators further objected to the request to take judicial notice of ITT's management representation letters. (Docket Entry No. 99). Relators argue that judicial notice is improper because "[r]elators are entitled to know of all management assertions ITT has made." (Docket Entry No. 99, p. 2). Relators have not explained how the absence of other documents makes the documents presented misleading. This court takes judicial notice of the documents referred to in Relators' second amended complaint that are central to their claims. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir.2000). The objections to judicial notice as to the ITT documents are overruled.

3. Relators filed suit under seal, under the FCA procedures, and notified the United States. On May 25, 2001, after the suit had been on file for almost two years, the government filed notice of its election to decline intervention. (Docket Entry No. 35). The government asked that only certain parts of the file be unsealed. On May 31, 2001, this

Defendants have moved to dismiss the claims against them. In the motions to dismiss the second amended complaint, ITT and PwC both assert that Relators have still failed to allege facts that, if proven, would show a basis for False Claims Act liability. PwC has moved to dismiss on the basis of both Rule 12(b)(6) and Rule 9(b); ITT moves only under Rule 12(b)(6). The motions, arguments, and responses are addressed in detail below.

## II. The Applicable Legal Standards

### A. The Rule 12(b)(6) Standard

A claim may not be dismissed under Rule 12(b)(6) "unless it appears certain that the plaintiff cannot prove any set of facts in support of her claim which would entitle her to relief." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Piotrowski v. City of Houston,* 51 F.3d 512, 514 (5th Cir.1995). In deciding a Rule 12(b)(6) motion, the factual allegations of the complaint must be accepted as true, *see Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972), and the complaint construed favorably to the pleader. *See Underwood v. Archer Mgmt. Servs., Inc.,* 857 F.Supp. 96, 97 (D.D.C.1994).

The court may consider the facts presented in exhibits to the complaint, as well as the factual allegations of the complaint itself. *See Zinermon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *Caine v. Hardy,* 943 F.2d 1406, 1411 n. 5 (5th Cir.1991); *see also* FED. R. CIV. PROC. 10(c)("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."). "The court will not accept as true allegations that are contradicted ... by other

allegations or by exhibits attached to or incorporated in the pleading." 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1363. The Seventh Circuit has held that

> [a] plaintiff is under no obligation to attach to her complaint documents upon which her action is based, but a defendant may introduce certain pertinent documents if the plaintiff failed to do so. Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993); *see also Sheppard v. Texas Dep't of Transp.,* 158 F.R.D. 592, 597 (E.D.Tex.1994) ("[A] court may rely upon a defendant's exhibit when it is referred to in the plaintiff's complaint and is central to plaintiff's claim"); 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1327 (2d ed. 1990) ("[W]hen plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading."). In this case, this court may consider the copies of the documents that Relators referred to in the second amended complaint and alleged contained the false statements made the basis of the FCA causes of action, that defendants attached to their motions to dismiss. Relators referred to the Program Participation Agreements, ITT's management attestation reports; PwC's compliance audit reports; PwC's audit opinion letters; and a portion of ITT's Form 10–K in the first amended complaint, and those documents are central to Relators' claims.

court entered an order unsealing the complaint, to be served on the defendants, and

keeping other parts of the file under seal. (Docket Entry No. 37).

Although this court must accept as true "well-pleaded" factual allegations in the complaint, the court need not accept as true "conclusory" allegations or allegations of inferences that are contradicted by the facts pleaded or set out in the exhibits attached to or incorporated in the pleading. *See, e.g., Blackburn v. City of Marshall,* 42 F.3d 925, 931 (5th Cir.1995) (" 'conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss' ") (quoting *Fernandez–Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5th Cir.1993)).

### B. The Rule 9(b) Standard

█ Federal Rule of Civil Procedure 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." *Id.* "Although the particularity demanded by Rule 9(b) differs with the facts of each case, a plaintiff pleading fraud must set forth 'the who, what, when, and where ... before access to the discovery process is granted.' Anything less fails to provide defendants with adequate notice of the nature and grounds of the claim." *Hart v. Bayer Corp.,* 199 F.3d 239, 248 n. 6 (5th Cir.2000). Rule 9(b) has four purposes: to ensure that the defendant has sufficient information to formulate a defense by having notice of the conduct complained of; to protect defendants against frivolous suits; to eliminate fraud actions in which all the facts are learned after discovery; and to protect defendants from undeserved harm to their goodwill and reputation. *See Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 783 (4th Cir.1999). Rule 9(b) must be interpreted and applied in light of these purposes. The Fifth Circuit has specifically held that "[t]he complaint in a False Claims Act suit must fulfill the requirements of Rule 9(b)." *United States ex rel. Russell v. Epic Healthcare Management Group,* 193 F.3d 304, 308 (5th Cir.1999) (citing *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 903 (5th Cir.1997)).

### III. The False Claims Act Claims in the Second Amended Complaint

#### A. The Statutory Framework

█ The purpose of the False Claims Act is "to provide for restitution to the government of money taken from it by fraud." *United States v. Hess,* 317 U.S. 537, 551, 63 S.Ct. 379, 87 L.Ed. 443 (1943). Liability under the False Claims Act occurs when a person or entity:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
>
> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; or
>
> (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a).

The term "knowingly" has a special meaning within the context of the False Claims Act:

> "knowing" and "knowingly" mean that a person, with respect to information—
>
> > (1) has actual knowledge of the information;
> >
> > (2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b). The FCA does not, however, define "false or fraudulent."

Defendants assert that the second amended complaint fails to allege a "claim" that was "false or fraudulent" or that was made with a "false statement." Defendants recognize that false certifications of compliance with a prerequisite to government payment may provide the "false statement" or "false claim" for the purpose of the False Claims Act. Defendants contend that Relators have not alleged facts necessary to state a cause of action under theories of either false certification or fraud in the inducement.

### B. The Requirement of a "Claim"

■ The Supreme Court has cautioned that the False Claims Act was not designed to punish every type of fraud committed upon the government. *See United States v. McNinch*, 356 U.S. 595, 599, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958). "[T]he statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'" *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir.1995). A central question in False Claims Act cases is whether the defendant presented a "false or fraudulent claim" to the government.

The False Claims Act states that a claim "includes any request or demand ... for money or property" where the government provides any portion of the money or property to the "contractor, grantee, or other recipient" or if the government will "reimburse such contractor, grantee or other recipient" for any portion of the money or property. 31 U.S.C.A. § 3729(c). The False Claims Act requires the presence of a claim—"a call upon the government fisc"—for liability to attach. *Harrison*,

176 F.3d at 785 (citing *United States v. McNinch*, 356 U.S. 595, 599, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958)). In *United States ex rel. Hopper v. Anton*, the court explained that:

It is not the case that any breach of contract, or violation of regulations, or receipt of money from the government where one is not entitled to receive the money, automatically gives rise to a claim under the FCA .... The FCA is far narrower. It requires a false claim. Thus, some request for payment containing falsities made with scienter (*i.e.*, with knowledge of the falsity and with intent to deceive) must exist.

91 F.3d 1261, 1265 (9th Cir.1996).

Relators have alleged two categories of payments in this case, guaranteed loans and direct student grants. Under the FFELP, a participating institution that has entered into a PPA, such as ITT, and an eligible student submit an application to a private lender for a loan on behalf of that student. The lender-typically a bank-issues a check for tuition, made payable to both the student and the institution, for the student to use to pay tuition. The Department of Education subsidizes interest payments on the loans during the period that the student is actively enrolled in classes and during certain grace periods. The loans are guaranteed by state agencies or nonprofit organizations and subsidized and reinsured by the Department of Education. If the student fails to repay the loans, the guaranteeing agency reimburses the lender for the balance and attempts to collect the unpaid amount. If the agency is unsuccessful, the Department reimburses the guaranteeing agency for the loss or accepts assignment of the loan. 20 U.S.C. § 1078(c)(1)(A); 34 C.F.R. §§ 682.400(b)(3), 682.404, 682.409(a)(1).

The cases recognize that when there is a government-insured loan, a claim under

the False Claims Act only occurs when the borrower defaults and the government must make payment. *United States v. Rivera,* 55 F.3d 703, 710 (1st Cir.1995); *United States v. Vanoosterhout,* 898 F.Supp. 25, 29 (D.D.C.1995). Under the FFELP, the government does not provide the loan to the student or to ITT; those funds are paid by the private lender. If there is a default, the guaranteeing agency reimburses the lender. If the agency is unable to collect, the government then reimburses the agency that guaranteed the loan. ITT does not receive government funds when the loan is made and if a default occurs, the government does not receive a demand for payment from ITT.

The Department calculates a "cohort default rate" on a school-by-school basis. Relator alleges that each year, the government incurs significant losses because of student defaults on government-insured loans, including defaults by students who borrowed money for tuition payments to ITT. However, the description of the operation of the federally guaranteed loan program does not identify a claim made by ITT for payment from the government, as necessary for a "claim" under the False Claims Act.

Relators also allege that ITT received funds through the federal Pell Grant Program. Only institutions that enter into a PPA may receive Pell Grant funds to disburse to its eligible students. The participating school requests funds from the Department to pay for grants for eligible students. Those funds are deposited in an institutional account, to be held in trust for the intended student beneficiaries and the Department. 34 C.F.R. § 668.161(b). The students, not the school, prepares an application for a Pell Grant, which the student may submit directly to the Department of Education or give to the school to transmit to the Department of Education. If the individual student applications are the "claims," they appear to be the claim of the student, rather than of the school. The only funds the school receives must be disbursed to the students within a few days. 34 C.F.R. § 668.162(b). ITT and PwC argue that nothing in this regulatory process identifies a "claim" that ITT submits to the government for payment.

Courts have held, without discussion, that applications for Pell Grants are "claims" that can provide a basis for False Claims Act liability both as to the student receiving the funds and to the school. *See, e.g., United States v. St. Augustine College,* 1991 WL 222099 (N.D.Ill. Oct.21, 1991) (college violated False Claims Act by disbursing Pell Grant funds to ineligible students); *United States v. Watkins,* 2002 WL 1263988 (N.D.Ill. June 5, 2002) (Pell Grant applicants submitted false information as to eligibility).

Relators have not alleged that the individual applications or requests for funds were false or contained false statements. The thrust of Relators' suit is that ITT and PwC falsely certified ITT's compliance with one of the requirements for participation in the Title IV, HEA program. Relators allege both a false certification and a fraud in the inducement basis for False Claims Act liability. Under these theories, misrepresentations of compliance with a regulation governing participation in a government contract is held to "taint" all claims submitted under that contract.

## C.  The Theory of False Certification

The "false certification theory" of False Claims Act liability is predicated on a false certification of compliance with a federal statute, regulation, or contractual term that is a prerequisite to obtaining a government benefit. A theory of "legally false" certification differs from "factually false" certification, which involves an incorrect description of goods or services pro-

vided or a request for reimbursement for goods or services never provided. *See Mikes v. Straus,* 274 F.3d 687 (2d Cir. 2001).

The Fifth Circuit, with the Second, Fourth, Ninth, and District of Columbia Circuits, has held that a claim under the False Claims Act is "legally false" only where a party affirmatively certifies compliance with a statute or regulation as a condition to receiving governmental payment or property. *See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899 (5th Cir.1997); *Mikes v. Straus,* 274 F.3d 687 (2d Cir. 2001); *United States ex rel. Hopper v. Anton,* 91 F.3d 1261 (9th Cir.1996); *United States ex rel. Siewick v. Jamieson Science and Engineering, Inc.,* 214 F.3d 1372 (D.C.Cir.2000); *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776 (4th Cir.1999). The Fifth Circuit has emphasized that liability for a false certification will lie only if compliance with the regulation was a prerequisite to government payment, and the defendant affirmatively certified such compliance. The violation of the statute or regulation does not create a cause of action under the False Claims Act; liability arises only if the defendant has made a false certification of compliance with the statute or regulation, when payment is conditioned on that certification.[4]

The Fifth Circuit, in *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* adopted an implied certification theory, but with limits. The Fifth Circuit emphasized that receiving government funds while in violation of a statute or regulation applicable to the funding program constitute false claims under the False Claims Act. "[W]here the govern-

ment has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation." 125 F.3d at 902.

In *Thompson,* the relator alleged that under Medicare, the defendant health care providers had to certify in annual cost reports that the services they had provided over the prior year met the regulations for healthcare services. The specific regulations and statutes precluded payment for referrals of Medicare patients and prohibited physicians from referring Medicare patients to entities that had certain financial relationships with the referring doctor. Certain of the regulations and statutes expressly prohibited submitting claims or receiving payment for services rendered in violation of the provisions. Defendant argued that its general statement of compliance with the laws and regulations governing the provision of healthcare services contained in the annual cost reports was not a prerequisite to receiving payment for those services. Defendant emphasized that it submitted claims for reimbursement and received payment shortly after the services had been rendered. The government reviewed and paid the claims long before the government received the annual cost reports. The relator responded that the annual cost reports with the certifications of compliance were nonetheless prerequisites to payment because "the retention of any payment received prior to the submission of an annual cost report is conditioned on the certification of compliance contained therein." *Id.* at 902–903. Because the record was unclear on that

---

4. The requirement of a false certification of compliance with a regulation that is a condition to payment is separate from, although related to, the requirement of materiality. "A

materiality requirement holds that only a subset of admittedly false claims is subject to False Claims Act liability." *Mikes v. Straus,* 274 F.3d 687, 697 (2d Cir.2001).

point, the Fifth Circuit denied defendants' Rule 12(b)(6) motions and remanded for further factual development. *Id.*

On remand, the district court found that the certifications of compliance in the annual cost reports stated claim under the False Claims Act. The certifications were a condition of retention of payments made during the prior year, as well as a condition of continued eligibility for participation in the Medicare program. *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F.Supp.2d 1017, 1034, 1041–42, 1046 (S.D.Tex.1998). Under the applicable regulations, the government made interim payments during the year for services rendered, but those payments were conditional. The right to retain the payments was not determined until the hospital's annual cost report was submitted, reviewed, and approved. Under the regulations, if the provider failed to make the certification and cost report, all the interim payments made during the year covered by the report could be deemed overpayments. Under these circumstances, the district court concluded that certification of compliance was a prerequisite to retaining the funds previously advanced on an interim basis. *Id.*

Since *Thompson*, the Fifth Circuit has reiterated that "when the government has conditioned payment of a claim upon a claimant's certification of compliance with a provision of a contract entered into pursuant to a regulation, a claimant submits a false claim as a matter of law when he or she falsely certifies compliance with that provision." *United States v. Southland Management Corp.*, 288 F.3d 665, 679 (5th Cir.2002), *reh'g en banc granted*, 307 F.3d

352 (5th Cir.2002). In that case, the court emphasized the two elements necessary to state a claim under a false certification theory of False Claims Act liability: the defendant makes a knowingly false certification of compliance with a statute or regulation and that certification is a prerequisite to payment.

In *United States ex rel. Mikes v. Straus,* another Medicare case, the Second Circuit limited implied false certification as a basis for liability to circumstances in which the underlying statute or regulation on which the relator relied expressly stated that the defendant must comply in order to be paid. The court held that the certification of compliance must be a precondition to payment before False Claims liability could attach, to avoid improperly broadening the Act's reach. 274 F.3d at 699–700.

In *United States ex rel. Siewick v. Jamieson Science and Engineering, Inc.*, the D.C. Circuit adopted a similar position, noting that "all courts of appeals to have addressed the matter" hold that a "false certification of compliance with a statute or regulation cannot serve as the basis for a *qui tam* action under the FCA unless payment is conditioned on that certification." 214 F.3d at 1376.[5] In *United States ex rel. Hopper v. Anton*, a teacher accused her school district of making a false claim for special education funds while failing to comply with state and federal laws governing special education services. The Ninth Circuit held that she could not maintain an action under the False Claims Act. The court held that the school district did not make a false claim when it certified that it " 'will meet ... all requirements of state and federal law.' "

**5.** In *U.S. ex rel. Augustine v. Century Health Services, Inc.*, 289 F.3d 409, 415 (6th Cir. 2002), the court held that Medicare cost reports submitted by defendant with a certification that it complied with all applicable instructions certified compliance with Medicare requirements and could give rise to False Claims Act liability "if the claimant violates its continuing duty to comply with the regulations on *which payment is conditioned.*" (Emphasis added).

91 F.3d at 1267. The school's certification was not a false certification of a present fact and there was no allegation that the school district's certification was the basis for the improper payment. *Id.*

In *Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519 (10th Cir.2000), the Tenth Circuit adopted an implied certification theory. The defendant in *AAA Engineering* was being paid for both photography services and for following specified environmental practices in disposing of certain solutions. When the defendant submitted invoices for full payment, knowing it had failed to provide some of the required services for which it was being paid, the implied certification theory applied. In *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999), the Fourth Circuit did not address the "validity and problems of an implied certification theory of liability," but noted that such claims are "questionable." *Id.* at 787.

This court applies the precedents on false certification claims to the second amended complaint.

**D. Relators' Allegations as to ITT's False Certifications**

■ Relators allege that ITT expressly falsely certified in the PPA its agreement to comply with the recruiter compensation provisions of the HEA. Each PPA states in bold print: "The execution of this agreement by the Institution and the Secretary is a prerequisite to the institution's initial or continued participation in any Title IV, HEA Program." (Docket Entry No. 43, Ex. 2). The PPA states that "provisional certification is granted for a limited period to permit the Institution to participate in Title IV, HEA Programs referenced in this Agreement." (*Id.* at p. 2). During the provisional certification period, the institution's participation is "subject to revocation for cause," which includes "failure to comply with any provision set forth in this Agreement, a violation of Department regulations deemed material by the Department, or a material misrepresentation in the material submitted to the Department as part of the Institution's application process for this certification." (*Id.*). The Agreement also states that "[t]he Department in its sole discretion may provide the Institution with an opportunity to cure any such failure, may place the Institution on reimbursement funding pending a decision regarding revocation of this Agreement ... or may suspend the participation of the Institution pending a decision by the Department regarding revocation of this agreement." (*Id.*). The PPA provides that if the Department chooses to revoke the PPA, "the Institution will have the right to show cause why this Agreement should not be revoked ...." (*Id.*).

The General Terms and Conditions section of the PPA states that "[t]he Institution understands and agrees that it is subject to and will comply with the program statutes and the implementing regulations for institutional eligibility as set forth in 34 CFR Part 600 and for each Title IV, HEA Program in which it participates, as well as the general provisions set forth in Part F and Part G of Title IV of the HEA ...." (*Id.* at p. 3). The General Terms and Conditions section also provides, in part, as follows:

> By entering into this Program Participation Agreement, the Institution agrees that:
>
> (1) It will comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority ....
>
> .    .    .    .    .

(12) It will provide the certifications described in paragraph (c) of this section;

. . . . .

(22) It will not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance .... [6]

(*Id.* at pp. 4–6).

Paragraph (c) states that in order to participate in any Title IV, HEA program, the institution must expressly certify: (1) that it has a drug abuse prevention program, and (2) that it has a campus security policy and has complied with disclosure requirements regarding campus security. (*Id.* at p. 6).

Another section, entitled "Certifications Required From Institutions," requires the institution to make the following express certifications:

- That no federal funds are being used for lobbying. (*Id.* at pp. 7–8).
- That the institution and its principals are not debarred by any federal department or agency and have not been convicted of a crime or had a fraud judgment entered against them within three years of the application. (*Id.* at p. 8).
- That the institution is a drug-free workplace. (*Id.* at pp. 8–9).
- That the institution has implemented and adopted a drug prevention program for its students and employees. (*Id.* at p. 9).

Nothing in the PPA required ITT expressly to certify compliance with the provision prohibiting incentive payments. In the PPAs, ITT agreed to comply in the future with the statutes and regulations governing the student financial assistance programs. However, the PPA did not require ITT to certify compliance with the incentive compensation prohibition.

The management attestation letters ITT provided to PwC as part of the periodic compliance audit contain certifications of compliance with the numerous requirements of the student financial assistance programs over the previous period. Each management representation letter stated that ITT "confirm[s], to the best of our knowledge and belief," that ITT has "complied with all SFA compliance requirements detailed in Exhibit I of this letter." (Docket Entry No. 76, Ex. 2, ¶ 2, p. 1). Exhibit I lists a number of compliance requirements, including that the institution has not in the past period under review "paid to any persons or entities any commissions, bonus, or other incentive payment based directly or indirectly in securing enrollments, financial aid to students, or student retention." (*Id.*). The management attestation letters were not submitted to the government, but to PwC, which would subject the letters, with the payroll and related compensation records, to testing, as part of the compliance audits. However, PwC included the management attestation letters in the compliance audit documents that were provided to the Department of Education. The critical issue is whether the management attestation letter certification of compliance with the statutory and regulatory provisions was a condition of payment.

The courts have addressed certifications in the form of an after-the-fact general statement that the entity receiving federal funds under a government program or contract has complied with all applicable

---

**6.** This is a verbatim recitation of 20 U.S.C. § 1094(a)(20).

statutes, laws, regulations, and contract terms. The courts have found no liability under the False Claims Act unless the certification is a prerequisite to payment. *Thompson,* 125 F.3d at 902–903. The statute or regulation at issue must expressly state that certification of compliance is a condition of payment. *Mikes,* 274 F.3d at 700. These courts identify the critical issue as whether the certification of compliance with a specific regulation or statute was a condition for payment. The courts in *Thompson* and *Mikes* recognized a distinction between generally certifying compliance with applicable regulations and statutes governing participation in a program, as opposed to certifying compliance with a particular requirement that is a prerequisite to receiving or retaining payment under that program. The *Thompson* decision emphasized that liability for false certification under the False Claims Act could arise only when the government has conditioned payment of a claim on the certification of compliance.

In *Mikes v. Straus,* the Second Circuit declined to follow a Court of Federal Claims opinion adopting a broader implied certification approach. 274 F.3d at 701–702. In *Ab–Tech Construction, Inc. v. United States,* 31 Fed. Cl. 429 (Fed.Cl. 1994), *aff'd,* 57 F.3d 1084, 1995 WL 358218 (Fed.Cir.1995) (unpublished table decision), the Court of Claims held that the defendants' submission of payment vouchers implicitly certified their continued compliance with the eligibility requirements of a federal small business statutory program, exposing them to False Claims Act liability. The Second Circuit significantly limited this approach, holding that the False Claims Act was not designed to enforce compliance with all regulations on participation in, or eligibility for, a particular government program, but only those regulations that expressly state that compliance is a precondition to payment or retention of payments. "[I]mplied false

certification is appropriately applied only when the underlying statute or regulation upon which the plaintiff relies expressly states the provider must comply in order to be paid." *Id.* at 700.

Since *Ab–Tech,* the Ninth Circuit, in *Hopper,* the Fifth Circuit, in *Thompson,* and the Second Circuit, in *Mikes,* have held that the appropriate inquiry is whether the defendants' certification of compliance with the regulation at issue was a condition to payment. A general statement of adherence to all regulations or statutes governing participation in a program through which federal funds are received is insufficient as a basis of False Claims Act liability.

These authorities, applied to the regulations and documents at issue here, show that the documents Relators allege as a basis for ITT's liability under the False Claims Act did not certify compliance as an express precondition to payment. The PPA acknowledges the application of a number of Title IV, HEA requirements, but does not certify compliance with the regulation governing incentive compensation. The management attestation letter is a general statement of compliance with applicable regulations and laws in a prior period under review. The regulations require that, among the conditions of initial and continued eligibility for the Title IV, HEA program, the institution may not make incentive compensation payments to its student recruiters or admissions personnel. However, the regulation does not expressly condition the delivery or disbursement of funds to ITT students on ITT's certification of compliance with this requirement. 20 U.S.C. § 1094(a)(20). In contrast, the regulations at issue in *Thompson* expressly prohibited the payment of government funds for services rendered in violation of the physician anti-referral statute. *Thompson,* 20 F.Supp.2d at 1040.

ITT's management attestation letters generally certified compliance with a number of requirements for the prior period under review, long after funds received had been received disbursed. ITT points out that the management attestation letter cannot be a condition of payment of funds because the student financial aid funds were paid long before the management attestation letter issued. Relators assert that they have alleged that ITT's retention of such funds was conditioned on the certification of compliance with, among other requirements, the avoidance of incentive compensation paid to certain personnel. (Docket Entry No. 96, pp. 14–15). However, a review of the second amended complaint does not reveal such an allegation and the regulations do not appear to provide a basis to make it. Relators cite 34 C.F.R. § 668.22, but that provision discusses refunds if students become ineligible, not if the institution becomes ineligible. There are a number of administrative remedies available for noncompliance with regulations governing Title IV, HEA, but Relators have not identified a regulation conditioning payment or retention of financial aid funds on certification of compliance with the prohibition on incentive compensation.

The regulations state that if a school fails to meet the compliance audit requirements, of which the management attestation letter is but one part, or if it loses its eligibility, or if it violates or fails to carry out regulatory requirements, the Department of Education has a number of administrative and other remedies available. These include requiring additional audits; taking action to terminate the institution's eligibility designation; taking action to limit the authority of the institution to disburse or deliver funds under Title IV, HEA programs; or imposing a civil penalty for a violation of, or failure to carry out, a regulatory requirement. 34 C.F.R. §§ 600.41(a)(1), (a)(2); 20 U.S.C. § 1094(c)(3)(B)(i)(II); 20 U.S.C. § 1099(c)(5). However, Relators did not allege or provide authority showing that ITT's receipt of Title IV, HEA funds in any year was on an "interim" or "provisional" basis," like the Medicare funds paid in *Thompson*, subject to forfeiture if ITT failed to submit the certification of compliance with the incentive compensation prohibition.

In contrast to the regulations at issue in *Thompson*, the regulations at issue here do not expressly condition payment or retention of the student loans and grants paid on behalf of students under Title IV, HEA on the submission of certification of compliance with the regulation or statute at issue. Like one of the regulations at issue in *Mikes*, the regulation that Relators allege was violated is a condition of eligibility to participate in the program, not an express condition of payment of specific claims or retention of payments. *See Mikes*, 274 F.3d at 702 (holding that because the regulation allegedly violated was a condition of participation, which did not "expressly condition *payment* on compliance with its terms," the certification of compliance was not legally false) (emphasis in original). Under the authority Relators cite, the PPA does not certify compliance and ITT's management attestation letter does not certify compliance with a regulation that makes the certification a requirement of payment or retention of funds.

Relators have failed to allege that ITT made false certifications of compliance on which payment was conditioned, so as to support a false certification cause of action under the False Claims Act.

### E. Relators' Fraud in the Inducement Claim

Relators assert that the second amended complaint states a cause of action

against ITT for fraud in the inducement as a basis for liability under the False Claims Act. This court has described False Claims Act liability under the "fraud in the inducement" theory as follows:

> In such a case, False Claims Act liability is asserted as to each claim submitted to the government under a contract, if that contract was originally obtained through false statements or fraudulent conduct. The claims for payment may be accurate, but the antecedent fraud in obtaining the contract makes each claim submitted a false or fraudulent claim.

*Wilkins,* 173 F.Supp.2d at 621; *see also Harrison,* 176 F.3d at 787–88 & n. 10 (describing history of fraud in the inducement claims in False Claims Act context).

However, this theory requires more than the allegation that a defendant has accepted federal funds while in violation of certain funding program requirements. *Hopper,* 91 F.3d at 1267. The most well-known fraud in the inducement False Claims Act case is *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943). In *Hess,* the Supreme Court found government contractors liable under the False Claims Act for claims submitted under a contract that was obtained through false statements in contract negotiations. *See also, United States v. Azzarelli,* 647 F.2d 757, 758 (7th Cir. 1981) (bid rigging involving highway construction project). In *Harrison,* the court explained that in fraud in the inducement cases, courts have found False Claims Act violations even where the defendant satisfactorily performed the work required for payment or receipt of benefits under a government contract, meeting the specifications, schedule, and the price agreed. 176 F.3d at 788 (discussing cases). "False Claims Act liability attached, however, because of the fraud surrounding the efforts to obtain the contract or benefit status, or the payments thereunder." *Id.*

This court's prior memorandum and opinion dismissed Relators' fraud in the inducement claim because Relators failed to allege facts showing that when ITT entered into the PPAs, ITT had no intention of complying with the provision on incentive compensation. (Docket Entry No. 64, p. 34). Relators now allege the following:

> ITT and Champagne fraudulently induced the Agency into paying Title IV, HEA Program benefits by entering into eighty-seven (87) PPAs with which they never intended to comply. ITT's ongoing practices were inconsistent with the promises made in the PPAs. ITT's practices of paying incentive compensation to its admissions representatives were inconsistent with its assertions in the PPAs, and indicate that Champagne and ITT had no intention of complying in the future with those requirements.

(Docket Entry No. 65, ¶ 41). Relators argue that the relevant intent may be inferred from "repeated unfulfilled promises." (Docket Entry No. 82, p. 17). However, the mere fact of nonperformance does not state a claim for fraudulent inducement. *United States v. Shah,* 44 F.3d 285, 293 n. 14 (5th Cir.1995) (holding that "there is no inference of fraudulent intent not to perform from the mere fact that a promise made is subsequently not performed"). The courts have emphasized that promissory fraud is a "rare" basis for liability under the False Claims Act. *Hopper,* 91 F.3d at 1267.

Relators rely on the "strong circumstantial evidence" of defendants' "reckless or conscious behavior"-namely, the "concealment from the Agency of the uncertainty about compliance." (Docket Entry No. 96, pp. 11–12). Relators point to a disclosure made in ITT's Form 10–K as demonstrating "knowing concealment" from the Department of Education. The disclosure first appeared in ITT's Form S–1 filed

when ITT made its initial public offering. It states:

> We believe that our method of compensating persons and entities engaged in student recruitment, admission or financial aid awarding activity complies with the requirements of the HEA. The regulations do not, however, establish clear guidelines for compliance, and we cannot assure you that the DOE will not find any deficiencies in our present or former methods of compensation.

(Docket Entry No. 14, ¶ 32).

The disclosure in the Form 10–K filing does not support an inference of fraud in the inducement from ITT's execution of the PPAs. The Form 10–K states that the compensation regulations do not establish clear guidelines for compliance and that governmental approval of ITT's salary arrangements cannot be "assured." This statement does not provide a basis for showing that when ITT signed the PPAs, it promised to comply with the regulation prohibiting incentive compensation to certain personnel, fully intending to violate that regulation. Relators have failed to allege facts that would show that by entering into the PPAs, ITT fraudulently induced the government to permit it to receive student financial aid funds. (Docket Entry No. 43, Ex. 2).

### F. Relators' Allegations as to PwC's False Statements or Certifications

█ Relators' allegations as to PwC are broad and sweeping. Relators argue that this case raises, as a "matter of first impression," whether "the United States can hold the accounting profession responsible when the Government disburses taxpayer dollars in reliance on the opinions issued by them?" (Docket Entry No. 83, p. 7).

That issue is not one of first impression, and it is not presented here. The issue on this motion to dismiss is whether in the second amended complaint, Relators have stated a claim against PwC for making false statements or false certifications of ITT's compliance with a regulatory condition for payment of a claim, in order to get false claims submitted by ITT approved and paid, in violation of the False Claims Act.

In the second amended complaint, Relators allege that PwC was aware of "uncertainty" as to whether ITT's compensation program violated the regulatory prohibition against incentive payments to certain personnel, which raised a "red flag." (Docket Entry No. 65 at ¶ 95). Relators contend that in the reports on ITT's financial statements that PwC prepared for submission to the Department of Education, PwC failed to disclose this uncertainty as to the legal status of ITT's compensation arrangements. Relators allege that this uncertainty meant that ITT faced a "massive liability to the U.S. Department of Education," which should have led PwC to issue a going concern qualification rather than a "clean" opinion on ITT's financial statements. (*Id.* at ¶¶ 67–69). Relators allege that PwC's failure made its statements in its opinions on ITT's financial statements that PwC had audited ITT's financial statements in accordance with GAAS, and that the financial statements were prepared in accordance with GAAP, false. (Docket Entry No. 83, p. 2). Relators allege that PwC failed adequately to consider the legality of ITT's salary program, failed to conduct a sufficient inquiry into whether such conduct was illegal, such as hiring a lawyer, and failed to report its own questions about the legality of the program. (*Id.* at ¶¶ 72–73).[7]

---

**7.** Relators allege that:

PW failed to evaluate the materiality of the illegal compensation practices that came to its attention, and failed to consider "both the qualitative and quantitative materiality" of the illegal conduct. PW knew, or alter-

To participate in the Title IV, HEA programs, ITT was required to have an outside auditor perform compliance or attestation examinations and examinations of the financial statements. PwC conducted its examinations under the *Government Auditing Standards* issued by the Comptroller General and under the *Audit (Attestation) Guide of Federal Student Financial Assistance Programs at Participating Institutions and Servicing Institutions*, issued by the United States Department of Education. The *Audit Guide* included a section on the auditor's examination of Institutional Eligibility and Participation. This section required examination of the management assertion letter stating that the institution had complied with the eligibility and participation compliance requirements of the Title IV programs, including the prohibition on making commission, bonus, or other incentive payments based on success in securing enrollments, student financial aid, or student retention. The *Audit Guide* instructed the auditor to "[t]est payroll and other disbursement records." (Docket Entry No. 73, Ex. P, pp. II–3, 4, and 7).

Relators point to language from the *SFA Audit/Attestation Guide*, which requires an engagement letter between ITT and PwC to include a "statement that both parties understand that ED [the Department of Education] intends to use the [auditor's] report to help carry out its oversight responsibilities of the Title IV programs." (Docket Entry No. 65, ¶¶ 23–24). However, this does not establish that PwC submitted a false statement or certification to get a false or fraudulent claim submitted by ITT paid.

Each of PwC's Report of Independent Accountants on ITT's financial statements contained language stating in relevant part as follows:

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of income and retained earnings and of cash flows present fairly, in all material respects, the financial position of ITT Educational Services, Inc. and its subsidiaries ... and the results of their operations and their cash flows for each of the three years in the period ended ... in conformity with accounting principles generally accepted in the United States. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States and *Government Auditing Standards*, issued by the Comptroller of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.

In accordance with *Government Auditing Standards*, we have also issued our report dated ... on our consideration of the Company's internal control over fi-

---

natively was reckless for failing to know, that ITT's illegal practices had a direct and material effect on amounts presented in the financial statements, and that the conduct had not been properly accounted for or the

liability to the Agency disclosed in the financial statements as required under AU § 317.

(*Id.* at ¶ 72).

nancial reporting and on our test of its compliance with certain provisions of laws, regulations, contracts, and grants. That report is an integral part of an audit performed in accordance with *Government Auditing Standards* and should be read in conjunction with this report in considering the results of our audit. (Docket Entry No. 73, Ex. E). That separate report on compliance and on internal control based upon the audit of financial statement, referred to in the last sentence, included the following statement:

As part of obtaining reasonable assurance about whether the Company's financial statements are free of material misstatement, we performed tests on its compliance with certain provisions of laws, regulations, contracts, and grants, noncompliance with which could have a direct and material effect on the determination of financial statement amounts.... However, providing an opinion on compliance with those provisions was not an objective of our audit, and accordingly, we do not express such an opinion. The results of our tests disclosed no instances of noncompliance that are required to be reported under *Government Auditing Standards*.

(*Id.*, Ex. J). PwC attached its financial statement reports for 1995 through 1999 to its motion to dismiss. (Docket Entry No. 173, Exs. F–J).

The specific language of PwC's audit reports on ITT's financial reports do not, contrary to Relators' allegations, make false or fraudulent statements under the False Claims Act. The audit reports state clearly that PwC is not providing a legal opinion on ITT's compliance with the regulatory or statutory requirements of the Title IV, HEA program. The reports are limited to an examination of historical financial statements. The reports clearly do not include opinions as to ITT's future financial condition, the likelihood of contin-

ued eligibility for HEA funding, or any statement about ITT's future viability as a going concern.

Relators argue that the second amended complaint alleges that ITT's financial statements were inaccurate, because ITT had a "massive liability" owing to the government that the financial statements did not reveal. The liability is apparently that if ITT is found to have violated the incentive compensation regulations, it may be ordered to return the student financial aid funds it received in breach of its contract with the government. (Docket Entry No. 107, p. 3). However, Relators have failed to allege facts showing that for the period of the historical financial statements PwC audited, ITT was under a "massive liability" owing to the government.

Relators argue that PwC was under an obligation to include in the reports on ITT's financial statements the disclosure that was part of ITT's Form 10–K, filed with the Securities & Exchange Commission. Relators assert that PwC should have disclosed in the audit reports ITT's inability to offer "assurances" of future Department of Education approval of the salary compensation arrangements. Relators do not explain how ITT's acknowledgment in its Form 10–K of the lack of clear guidelines for the regulation governing incentive compensation equates to a requirement that PwC issue a qualified or adverse opinion on ITT's financial statements. Relators do not explain how ITT's acknowledged inability to assure future Department of Education legal action approving the compensation system equates to a requirement that PwC should have issued a qualified or adverse opinion on ITT's historical financial statements. Nothing in the Form 10–K shows that ITT or PwC knew that the Department of Education would definitely find that the compensation system violated the regulations. Nothing

in the Form 10–K statement makes PwC's statement of the scope or results of its audit false.

PwC tested ITT's payroll and other records as part of the audit, to determine whether they supported ITT's financial condition, as reflected in the financial statements and to determine whether there were instances of noncompliance that had to be disclosed under the *Government Auditing Standards*. PwC clearly stated that it did not express an opinion as to whether ITT had in fact met all the regulatory requirements imposed under the Title IV, HEA program.

Relators also allege that PwC's compliance reports for the company were false statements or false certifications. Relators allege that the Department of Education regulations required PwC to audit ITT's assertion that it was in compliance with the laws and regulations applicable to Title IV, HEA programs. (*Id.* at ¶ 21). Relators allege two false statements in these reports: that PwC had "conducted attestation/compliance audits in accordance with the standards" of Title IV; and that "ITT was in compliance with the law respecting the prohibition against paying commissions, bonuses or incentive compensation to admissions representatives." (*Id.* at ¶ 42).

PwC's compliance audit letters to ITT included the following representative language:

> We have examined management's assertions that ITT Educational Services, Inc. (the "Company") complied with the specific compliance requirements listed in the accompanying schedule of Specified Compliance Requirements (pages 17–30), listed in Section II of the U.S. Department of Education's Audit Guide,... relative to participation in the Federal Student Financial Assistance Programs during the year ended ... Management is responsible for the Company's compli-

ance with those requirements. Our responsibility is to express an opinion on the Company's compliance based on our examination.

> Our examination...included examining, on a test basis, evidence about the Company's compliance with those requirements and performing such other procedures as we considered necessary in the circumstances. We believe that our examination provides a reasonable basis for our opinion. Our examination does not provide a legal determination on the Company's compliance with specified requirements.

> In our opinion, management's assertions that the Company complied with the aforementioned requirements for the year ended ....are fairly stated, in all material respects.

(Docket Entry No. 73, Ex. O). PwC's attestation reports dated January 1996, 1997, 1998, 1999, and 2000 are attached to PwC's motion to dismiss the Second Amended Complaint. (Docket Entry No. 73, Exs. K–O). Each contains similar language.

The compliance reports are limited on their face. They state that PwC was not providing a legal determination as to ITT's compliance with specified requirements. Relators do not allege any fact that, if proven, would show that PwC failed to "conducted attestation/compliance audits in accordance with the standards" of Title IV. Relators allege that ITT's statement that it was in compliance with the regulations which include the prohibition on incentive compensation to admissions representatives or recruitment personnel, was false. However, PwC expressly stated that it was not expressing an opinion on whether ITT was in compliance with the regulatory requirements or not.

Relators have failed to allege facts that, if proven, would provide a basis for finding

PwC liable for making a false claim or a false statement to get a false or fraudulent claim paid or approved by the government. Relators have failed to allege facts that, if proven, would provide a basis for finding PwC liable under a false certification theory.[8]

### G. Relators' Section 3729(a)(7) Claim

Relators also allege that defendants violated the "reverse false claim" provision of the False Claims Act. Section 3729(a)(7) imposes liability on one who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." Defendants argue that Relators have not alleged that PwC made a "false statement" to "conceal, avoid, or decrease an obligation to pay or transmit money to the Government."

In *American Textile Manufacturers Institute, Inc. v. The Limited, Inc.*, 190 F.3d 729 (6th Cir.1999), the Sixth Circuit analyzed section 3729(a)(7), as follows:

> [W]e hold that a reverse false claim action cannot proceed without proof that the defendant made a false record or statement at a time that the defendant owed to the government an obligation sufficiently certain to give rise to an action of debt at common law. Whatever its scope, the False Claims Act clearly encompasses specific and legal duties to pay or transmit money or property to the government. A defendant risks liability when making a false statement to conceal, avoid, or decrease obligations such as his prior acknowledgment of

indebtedness, a final court or administrative judgment that the defendant owes money or property to the government, or a contractual duty to pay or transmit money or property to the government.

*Id.* at 736. The *American Textile Manufacturers* court explicitly adopted an approach taken by the Eighth Circuit in *United States v. Q International Courier, Inc.*, 131 F.3d 770 (8th Cir.1997), in which that court held:

> To recover under the False Claims Act, we believe that the United States must demonstrate that it was owed a specific, legal obligation at the time that the alleged false record or statement was made, used, or caused to be made or used. The obligation cannot be merely a potential liability: instead, in order to be subject to the penalties of the False Claims Act, a defendant must have had a present duty to pay money or property that was created by a statute, regulation, contract, judgment, or acknowledgment of indebtedness.

*Id.* at 773.

■ These cases make it clear that a government contractor's potential liability for fines or sanctions that might be imposed at some indefinite point in the future, in some indefinite amount, is not an "obligation to pay" under section 3729(a)(7). Even if the government's sanctions for noncompliance could include the ability to sue for reimbursement of previously funded monies, that potential does not arise to an "obligation to pay" that would support a reverse False Claims Act

---

8. Additionally, Relators have failed to cite a case in which a court has adopted a false certification theory in the context of a third party defendant who allegedly made the false statement. Relators' claims against PwC do not state a claim for false certification because the audit reports and compliance reports did not certify ITT's compliance with

the regulation prohibiting incentive compensation as a precondition to payment. *Mikes*, 274 F.3d at 702 (holding that because statute was a condition of participation, which did not "expressly condition *payment* on compliance with its terms," the certifications were not legally false) (emphasis in original).

claim. *See also United States ex rel. Lamers v. City of Green Bay,* 998 F.Supp. 971 (E.D.Wis.1998), *aff'd,* 168 F.3d 1013 (7th Cir.1999).

■] Relators' claim under this section against defendants fails because Relators have not alleged facts that, if proven, would show that when defendants made the alleged false statements, ITT owed the United States a specific amount of money. There is no allegation that when PwC issued its audits of ITT's historical financial statements, ITT was then under a certain obligation to pay the United States money. This court GRANTS defendants' motion to dismiss Relators' section 3729(a)(7) claim.

### H. Relators' Section 3729(a)(3) Conspiracy Claim

■■■ To state a claim under section 3729(a)(3), a plaintiff must allege facts showing that "(1) the defendant agreed with one or more persons to get a false or fraudulent claim allowed or paid by the United States; and (2) one or more conspirators performed any act to effect the object of the conspiracy." [9] *Ex rel. Wilkins,* 173 F.Supp.2d at 639. General civil conspiracy principles apply to conspiracy claims under the False Claims Act. *See United States ex rel. Durcholz v. FKW, Inc.,* 189 F.3d 542, 546 n. 3 (7th Cir.1999).

■■■ Relators explain that the conspiracy claim was added because the attestation reports "specifically required PW to investigate and report on whether ITT was paying incentive compensation to its admission representatives." (Docket Entry No. 83, p. 5). Relators allege the purpose of the conspiracy between PwC and ITT:

[PwC] never breathed a word to the Agency or disclosed in its compliance audit reports any concern about the legality of ITT's compensation practices for admissions representatives. Upon information and belief, PW and ITT agreed and conspired to, and did, exclude from PW's attestation reports the critical language in the Form 10–K filings that would have alerted the Agency to the illegal compensation practices, in violation of 31 U.S.C. § 3729(a)(3).

(Docket Entry No. 65, ¶ 45). Relators contend that they allege that PwC "intentionally withheld material information from the U.S. Department of Education to permit a fraud to continue. This constitutes strong circumstantial evidence that could lead to a reasonable inference that there was an agreement between ITT and PW." (Docket Entry No. 83, p. 29).

PwC and ITT point out that Relators allege an unusual conspiracy to conceal facts, by reporting them in a Form 10–K. However, the conspiracy claim fails for a more fundamental reason. This court has found that none of the False Claims Act claims against PwC or ITT state a cause of action and must be dismissed under Rule 12(b)(6). The conspiracy claim fails as a matter of law because Relators have not alleged an unlawful agreement between the parties. *United States ex rel. Atkinson v. Pennsylvania Shipbuilding Co.,* 2000 WL 1207162, at *12 (E.D.Pa. Aug. 24, 2000) (noting that an "agreement to act lawfully" is "not an actionable claim for an FCA conspiracy.") (following citation omitted). "The essence of a conspiracy under the Act is an agreement between two or more persons to commit a fraud." *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Provident Life & Accident Ins. Co.,* 721 F.Supp. 1247, 1259

---

9. That provision reads as follows:
 § 3729. False claims
  (a) Liability for certain acts.—Any person who—

. . . . .
(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

(S.D.Fla.1989) (citing *Blusal Meats Inc. v. United States,* 638 F.Supp. 824, 828 (S.D.N.Y.1986)).

### I. ITT's Motion to Dismiss Newman's Wrongful Termination Claim

Relators allege a new cause of action under section 3730(b) for the wrongful termination of Susan Newman. Relators allege that Newman was "wrongfully terminated by ITT on February 7, 2000 in retaliation for bringing the instant lawsuit," and that ITT contacted other schools to disclose Newman's involvement with the instant litigation. (Docket Entry No. 85, ¶¶ 100–102).

In order to bring a False Claims Act retaliation claim, a plaintiff must plead facts that, if proven, would show that: (1) the employee engaged in activity protected under the statute; (2) the employer knew that the employee engaged in protected activity; and (3) the employer discriminated against the employee because she engaged in protected activity. *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.,* 275 F.3d 838 (9th Cir.2002). ITT contends that the Relators have alleged none of the elements necessary to state a wrongful termination claim.

ITT contends that, as a matter of law, ITT could not have known of Newman's protected conduct because the complaint was under seal until July 2001, which is almost a full year after Newman was fired. ITT argues that the only way that it could have known if Newman filed the complaint would be if she violated the court's sealing order and informed ITT. Newman makes no such allegation. Relators respond that for the purpose of testing the sufficiency of the pleadings under Rule 12(b)(6), this court should not "examine the sufficiency of relators' evidence to support their allegations," but accept them as true. (Docket Entry No. 82, p. 21).

An employee is entitled to whistleblower protection under the FCA antiretaliation provisions only if "the employer is aware that the employee is investigating fraud." *Hopper,* 91 F.3d at 1269. Newman has not alleged facts supporting her claim that when ITT terminated her employment, ITT knew that she was investigating fraud. Relators do not allege that Newman was engaged in investigative steps months before she filed the lawsuit, that formed the basis of ITT's decision to terminate her employment. Rather, Relators allege only that Newman engaged in "lawful acts in furtherance of an action under the False Claims Act." The act of bringing this suit, without more, cannot provide a basis for a claim of wrongful termination because ITT did not know of the pendency of this suit until almost a year after Newman was terminated. This court GRANTS ITT's motion to dismiss Relators' wrongful termination claim.

### IV. Conclusion

Three attempts to plead is sufficient. *See Fernandez–Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 285 (5th Cir.1993). This court GRANTS the motions to dismiss, with prejudice, Relators' claims under the False Claims Act, for failure to state a claim. Final judgment will issue by separate order.