# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 12-1369, 12-1967, 12-1979, 12-2008 & 12-2891

DEBRA LEVESKI,

*Plaintiff-Appellant*,

*v.*

ITT EDUCATIONAL SERVICES, INCORPORATED,

*Defendant-Appellee*,

and

APPEALS OF:

MOTLEY RICE LLP, PLEWS SHADLEY RACHER &
BRAUN LLP, THE LAW OFFICES OF
TIMOTHY J. MATUSHESKI and
TIMOTHY J. MATUSHESKI.

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:07-cv-00867-TWP-MJD—**Tanya Walton Pratt**, *Judge.*

ARGUED JANUARY 17, 2013—DECIDED JULY 8, 2013

Before MANION and TINDER, *Circuit Judges,* and LEE, *District Judge.**

TINDER, *Circuit Judge.* Debra Leveski brings this lawsuit against ITT Educational Services, Inc. on behalf of the United States, pursuant to the *qui tam* provision of the False Claims Act (FCA), 31 U.S.C. § 3730(b). ITT is a for-profit institution with over 140 locations across the United States that offers post-secondary educational training, including associate's, bachelor's, and master's degrees. Leveski, who worked at the ITT campus in Troy, Michigan, for more than a decade, alleges that ITT knowingly submitted false claims to the Department of Education in order to receive funding from federal student financial assistance programs.

Four years after Leveski filed this lawsuit, the district court dismissed it for want of jurisdiction, finding that Leveski's allegations had already been publicly disclosed and that Leveski was not the original source of her allegations. In addition, the district court granted sanctions in the amount of $394,998.33 against all three law firms representing Leveski and against one of Leveski's attorneys individually. Accusing Leveski's attorneys of "pluck[ing] a plaintiff out of thin air and tr[ying] to manufacture a lucrative case," the district court found Leveski's allegations wholly "frivolous."

Contrary to the district court, we believe that Leveski's allegations merit further development, and more impor-

---

* The Honorable John Z. Lee of the Northern District of Illinois, sitting by designation.

tantly, we believe they are sufficiently distinct from prior public disclosures to give the federal district court jurisdiction over Leveski's lawsuit. Consequently, we reverse both the dismissal and the sanctions, and we remand the case back to the district court for further proceedings.

# I

Leveski's FCA allegations turn on the restrictions placed on schools that receive funding from federal student financial assistance programs by the Higher Education Act (HEA), 20 U.S.C. § 1001 *et seq*. Therefore, before turning to the specifics of Leveski's allegations, we first review the specifics of the relevant HEA restrictions. The HEA was originally passed in 1965 "[t]o strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education." Pub. L. No. 89-329, 79 Stat. 1219. At issue in this case is Title IV of the HEA, "Grants to Students in Attendance at Institutions of Higher Education," codified at 20 U.S.C. § 1070 *et seq.* In passing Title IV, Congress had the best of intentions:

> to provide, through institutions of higher education, educational opportunity grants to assist in making available the benefits of higher education to qualified high school graduates of exceptional financial need, who for lack of financial means of their own or of their families would be unable to obtain such benefits without such aid.

Pub. L. No. 89-329, 79 Stat. 1219, § 401(a). Today, Title IV governs the administration of over $150 billion in annual federal financial assistance awards for higher education. U.S. Dept. of Educ., *Federal Student Aid: About Us*, http://studentaid.ed.gov/about (last visited July 1, 2013).

Notwithstanding Congress's good intentions in passing Title IV, the colossal sums of money now administered under Title IV have led to abuses. Specifically, Congress became concerned in 1992 that "recruiters [of students for institutions of higher education] paid by the head are tempted to sign up poorly qualified students who will derive little benefit . . . and may be unable or unwilling to repay federal guaranteed loans." *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005). As a result, Congress amended Title IV to prohibit institutions receiving federal financial assistance funding from "provid[ing] any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." 20 U.S.C. § 1094(a)(20).

In 2002, the Department of Education issued regulations that softened the blow of the 1992 amendments for institutions of higher education by declaring certain types of activities and compensation schemes compliant with 20 U.S.C. § 1094(a)(20). Known as "safe harbors," these twelve provisions allowed, among other things,

institutions receiving federal financial assistance award money to pay student recruiters and financial aid officers "fixed compensation, . . . as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid." 34 C.F.R. § 668.14(b)(22)(ii)(A) (2002). These safe harbors remained in effect for almost a decade, until the Department of Education became concerned that they had failed to curtail abusive recruiting practices. *See, e.g.*, Department of Education, *Program Integrity Issues: Incentive Compensation*, 46-52, http://www2.ed.gov/policy/highered/reg/hearulemaking/2009/integrity-session3-issues.pdf (last visited July 1, 2013) (detailing common abuses and recommending that "the elimination of all of the regulatory 'safe harbors' would best serve to effectuate congressional intent"). Thus, the Department of Education eliminated the safe harbor provisions from its regulations in 2011, and its current regulations now flatly prohibit institutions receiving federal award money from adjusting the salaries of student recruiters and financial aid officers "based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid." 34 C.F.R. § 668.14(b)(22)(ii)(A) (2013). Institutions of higher education must continually certify their compliance with the current Department of Education regulations through program participation agreements (PPAs) in order to receive federal financial assistance award money. 20 U.S.C. § 1094(a).

With this brief history of HEA regulations in mind, we turn back to the allegations in the case at hand.

Leveski's decade-long employment with ITT began on January 8, 1996, meaning that the 2002 safe harbor provisions were in effect during the latter half of her employment. ITT initially hired Leveski as an Inside Recruitment Representative (RR) for the Troy campus. (Dkt. 75, 2.) As an Inside RR, Leveski was responsible for "contact[ing] consumers via telephone through leads provided . . . by ITT's directors of recruitment at the Troy campus, . . . persuad[ing] them to visit the Troy campus[, and] . . . persuad[ing] them to enroll and start classes at ITT." (Dkt. 49-1, 1-2.) (Inside RRs did their recruiting inside the ITT campus. Outside RRs, in contrast, visited high schools to recruit students.) (Dkt. 141-6, 101.)

From the beginning of Leveski's employment as an Inside RR, ITT made the importance of her "numbers" very clear. (Dkt. 75, 11.) According to Leveski, both Inside and Outside RRs were directed to increase "applications, enrollments, and starts" at every group meeting. (Dkt. 75, 10.) A prospective student who had filled out an ITT application and paid a $100 fee (before ITT waived the fee in 2001) was counted as an "application" for Leveski. A prospective student who had additionally passed an entrance exam and completed the financial aid process—basically, anyone who had "done everything but sat in class"—counted as an "enrollment" for Leveski. A prospective student who actually attended a class counted as a "start" for Leveski. (Dkt. 141-6, 53-54.) By all appearances, these applications, enrollments, and starts had real ramifications for Leveski and the other RRs; RRs were constantly reminded by the Troy campus director "that if they wanted an increase in pay, they must

increase applications, enrollments, and starts." (Dkt. 75, 10.) To further incentivize them, ITT published each RR's sales goals in a quarterly memorandum distributed throughout the corporate district (Dkt. 75, 10.)

Although ITT's sole focus appeared to be on "numbers," it claimed to evaluate employees like Leveski on a multitude of criteria, including professional development, the attrition rate of enrolled students, "being a team player," appearance, and attitude. (Dkt. 141-6, 106-07.) But according to Leveski, these other criteria—which were specifically listed on the employee's annual evaluation form—did not matter to ITT. Over time, Leveski came to realize that her success in attaining applications, enrollments, and starts directly correlated with her alleged success in ITT's other job evaluation criteria. In other words, when Leveski had a good numbers year, she also had a good team player, appearance, and attitude year. When Leveski had a bad numbers year, she had similarly bad scores all around.

Of course, correlation does not prove causation, and it is certainly plausible that Leveski had good years and bad years all around. But Leveski offers evidence suggesting that the direct correlation between her "numbers" evaluation and her other job criteria evaluations was no coincidence. Rather, Leveski suggests that the other job criteria listed on the employee evaluations were simply a sham to cover up the only thing that truly mattered to ITT: the number of applications, enrollments, and starts. In an affidavit, Leveski described the many incidents that led her to believe that the other job criteria were a sham:

ITT corporate employees and Troy campus directors continually reminded sales representatives to meet sales targets to obtain raises and stay employed, but never discussed tactics to meet other non-sales targets that were included in our yearly review as sales representatives such as assisting the school in meeting its attrition budget, being a team player, appearance and attitude.

(Dkt. 49-1, 12.)

During the review process as a sales representative, I questioned Steve Sorensen, Patricia Hyman and Bob Martin regarding how my success in helping ITT Troy Campus to obtain the attrition rate set by ITT corporate was evaluated during the review. I also asked them how ITT defined attrition rate and calculated it. I was never given a clear explanation of what attrition rate meant or how it was calculated, nor how my rating for appearance, attitude, and team player was evaluated. In fact, to my knowledge, ITT did not keep track of any non-recruitment criteria during each academic quarter.

(Dkt. 49-1, 12-13.)

[D]uring my reviews . . . when I did not significantly exceed my sales targets—the non-recruitment criteria on my reviews dropped from the top performance level of "Very Exceptional Results" to "Results at Standard." I asked my supervisor who conducted the review why my non-sales criteria decreased in unison with my sales

> criteria. I was reassured that the score I received in my review—the results of which determine the percentage of my pay raise—were solely based upon my sales targets.

(Dkt. 49-1, 13.) Similarly, when asked at her deposition how she came to believe that ITT only considered the number of applications, enrollments, and starts in evaluating RRs, Leveski provided the following examples:

> My first year there, 1996, I received a 1 [overall evaluation score, which was the highest possible score]. I did an exceptional job; I got a 1 in my appearance. I wore the same suits the first day I started to work at ITT and the last day I left ITT. I didn't get a 1 again in appearance. It doesn't make any sense. And when I questioned managers about this, [they answered,] because, Debbie, they don't care. All they want you to do is make your numbers. They want you to start students. It is a number game.

(Dkt. 141-6, 88.)

> You received your raises based on the students that started. It didn't matter how you dressed, it didn't matter what college courses you took. You didn't end up getting a raise because you got a master's degree in education. You didn't get a 1 for doing that. I didn't know what the criteria was [sic]. . . . Look at [my professional development evaluation.] What more did I have to do to get a 1 in that category? Go for a Ph.D.? I mean, we . . . had representatives at that time taking

religious classes, because ITT didn't define what professional development was. So Joie Bowman [another ITT employee] went and took something at her church.

(Dkt. 141-6, 87.)

Q. Who told you you get paid based on your starts?

A. [ITT managers] Patricia Hyman, Dave McDaniel, Steve Sorensen, Bob Martin, [and] representatives. If you want me to name them, I will name them.

Q. Yes, what representatives also told you that?

A. Joie Bowman, Dave McKinnon . . . I can't think of any others.

Q. What specifically did Ms. Hyman tell you?

A. You know it's a numbers game; you're going to get paid on the number of students you start.

(Dkt. 141-6, 73-74.)

Despite her concerns over how she was being evaluated, for the most part, the evaluations turned out well for Leveski. For four out of the six years that she was employed as an RR, Leveski met or exceeded her starts goal number, and for five out the six years she received at least the median rating for overall performance. Moreover, Leveski received a salary increase after every evaluation (although this increase was much higher in years that she exceeded her numbers goal). (Dkt. 49-1, 14-

15.) Consequently, Leveski continued to work for ITT as an Inside RR until a better opportunity arose.

That opportunity came in 2002, when ITT offered Leveski the chance to move from the hourly position of Inside RR to the salaried position of Financial Aid Administrator (FAA). (Dkt. 141-6, 50.) Leveski began her new FAA job on April 15, 2002, and quickly discovered it was a new sort of "numbers game." (Dkt. 49-1, 15.) Instead of worrying about the numbers of applications, enrollments, and starts, Leveski now had to worry about the numbers of students she successfully "packaged." Once a student had completed ITT's application process and had passed the entrance exam, the student came to an FAA. There, the FAA "packaged" the student—collecting personal and demographic information on the student, inquiring about personal and family income, and helping the student complete the necessary forms to receive financial aid. (Dkt. 141-6, 39-40.)

According to Leveski, the number of students successfully "packaged" directly impacted an FAA's pay. Despite the fact that FAAs were paid a salary, instead of being paid by the hour, Leveski alleges that an FAA's packaging numbers determined whether the FAA received a raise in her salary. (Dkt. 49-1, 17.) Specifically, Leveski came to believe over time that ITT only cared about how much federal financial assistance award money she could secure for the school, and how quickly she could do it. As with her claims about ITT's compensation of RRs, Leveski did not arrive at this conclusion through complete guesswork. Rather, she details specific

conversations that led her to reach this conclusion in both her affidavit and her deposition testimony, including:

> Liz Franck, Kim Zwierzchowski, Stephen Goddard, Richard Zeeman, and Matt Diemling [Leveski's supervisors as an FAA] . . . stressed to all financial aid administrators at frequent meetings that goals of securing financial aid for ITT students must be met to get a raise.

(Dkt. 49, 1, 18-19.)

> Q. What did Mr. Diemling [the director of financial aid at the Troy campus] tell you?
>
> A. That I would receive an increase in wages by securing federal funding for students by getting them repacked or packaged.

(Dkt. 141-6, 346.) Leveski also notes in her affidavit that her yearly goals were always defined in terms of her ability to secure the most federal award money "by the first available date permitted by Federal law." (Dkt. 49-1, 17.) Leveski's success in meeting these yearly goals directly determined how much of a raise she would receive the following year. (Dkt. 49-1, 17-18.) In sum, it did not take Leveski long in her new position as an FAA to realize that ITT was "looking for the money, and [it] want[ed] the money to come in on the first day it's available." (Dkt. 141-6, 192-93.) With the constant emphasis on numbers throughout the FAA office, Leveski realized, once again, that the only things that mattered to ITT were the numbers. (Dkt. 141-6, 193.)

Although the numbers were important for both RRs and FAAs, according to Leveski, the pressure to meet

number goals led to some particularly unsavory behavior among the FAAs. The pressure to secure as much federal award money for ITT as quickly as possible led many managers and FAAs to underreport students' incomes, to overlook discrepancies in the students' applications, and even to falsify financial aid documents. Again, Leveski provided specific examples of this behavior in her deposition:

> Q. Ms. Leveski, were you ever instructed by a manager at ITT to falsify financial aid forms?
>
> A. Yes.
>
> Q. Who instructed you to falsify financial aid forms?
>
> A. Richard Zeeman.
>
> . . .
>
> Q. What did Mr. Zeeman instruct you to do in 2005 that you thought was improper?
>
> A. He asked the financial aid advisors and myself to falsify documents so that we could get the students packaged.
>
> . . .
>
> Q. . . . Why do you contend Mr. Zeeman instructed you to falsify financial aid documents?
>
> A. Because he called three of us in his office behind closed doors and asked us to falsify documents so that we could get our students packaged.

(Dkt. 141-6, 393-94.)

Q. Okay. You just testified that you're aware of other FAAs falsifying documents at ITT; is that right? . . . Why do you contend that they falsified documents, they being the unnamed FAAs?

A. When you would meet with an individual, and there were many individuals out there that work under the table. They don't put down the income on the FAFSA [Free Application for Federal Student Aid]. And . . . I would say to them, How much money did you make? Oh, I made $10,000, but it was all under the table. I made them write it on the FAFSA. Other FAAs just looked the other way. They didn't have it recorded. . . . At that point I would say, Okay, . . . you were required by law to file federal income tax. Well, the person would get very upset sometimes. I'd end up calling my manager in, and . . . in some instances the manager would either come back and say to me, and possibly the Director of Finance, that the person made a mistake. He didn't mean he had made $10,000.

(Dkt. 141-6, 151-52.) Despite the less-than-honest atmosphere that prevailed throughout the financial aid office, Leveski continued to work there for four more years. In 2005, she filed a sexual harassment lawsuit against ITT, which settled on November 3, 2006. (Dkt. 49-1, 1; Dkt. 141-6, 247.) As part of the settlement agreement, Leveski agreed to end her employment with ITT, and the parties appeared to part company forever.

But an express mail letter brought the parties back into conflict only six months later. On May 17, 2007, Leveski received a letter from private investigator Davy Keith, informing Leveski that he worked for a Mississippi attorney who would like to speak to her. (Dkt. 141-6, 239.) Leveski was not sure why a Mississippi attorney would want to speak to someone in Michigan; nonetheless, Leveski called Keith's phone number and left a message on his answering machine. Later that day, Leveski received a phone call directly from the Mississippi attorney, who turned out to be Timothy J. Matusheski (one of the original attorneys who filed the present lawsuit). Matusheski, it seems, had hired Keith to find former ITT employees who had previously filed lawsuits against the company. Apparently assuming that they would be predisposed to think ill of their former employer, Matusheski contacted these former employees, with the hope of finding one who had enough damaging information against the school to bring an FCA lawsuit. (Dkt. 141-6, 240-43.)

Before talking to Matusheski, Leveski admittedly had never considered filing an FCA suit against ITT. (Dkt. 141-6, 244.) However, after learning about a potential FCA claim from Matusheski, Leveski began conducting some independent research, which included "t[aking] a closer look at my own reviews . . . [and] doing searches on the Internet in reference to Title IV funding and the rules and regulations." (Dkt. 141-6, 294.) During her research, she also reviewed previous *qui tam* actions against ITT, including *United States ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp. 2d 487 (S.D. Tex. 2003) and *U.S. ex rel.*

*Olson v. ITT Educ. Servs., Inc.*, No. 1:04-CV-0647-JDT-WTL, 2006 WL 64597 (S.D. Ind. Oct. 20, 2005). Leveski did not limit her research to ITT; in fact, Leveski also researched Matusheski—who had been completely unknown to her before the private investigator's letter—looking up information about him on the internet as well as contacting her previous attorney from the sexual harassment suit. (Dkt. 141-6, 247.) After all this research, Leveski decided that she wanted to bring a *qui tam* action against ITT, and Matusheski was the attorney to file it.

Thus, Matusheski (along with another attorney who has subsequently withdrawn) filed this case under seal in the Southern District of Indiana (the location of ITT's corporate headquarters) on July 3, 2007, and the long procedural history of this case began. The Department of Justice declined to intervene in Leveski's case on November 13, 2008, and the court unsealed Leveski's case shortly thereafter. (Dkt. 23, 1.) On January 30, 2009, ITT filed its first motion to dismiss Leveski's case pursuant to Fed. R. Civ. P. 9(b), 12(b)(1), and 12(b)(6), claiming that (1) the "'fraudulent scheme' alleged by Leveski in this matter is identical" to the one alleged in *Graves*, 284 F. Supp. 2d at 490-93, so 31 U.S.C. § 3730(b)(5) barred subject-matter jurisdiction over Leveski's case in federal court, (2) Leveski's case was barred by a release she signed after settling her sexual harassment suit with ITT, (3) Leveski had failed to plead her allegations of fraud with sufficient particularity, as required by Fed. R. Civ. P. 9(b), and (4) Leveski had made her allegations in a conclusory manner, in violation of Fed. R. Civ. P. 12(b)(6).

(Dkt. 40.) On September 23, 2009, Judge William T. Law-rence, the original district court judge assigned to Leveski's case, dismissed it under Fed. R. Civ. P. 9(b), finding that Leveski had "all but admit[ted] that she has not plead her allegations with sufficient particular-ity," but gave Leveski the option to file an amended complaint within fifteen days. In issuing this order, the judge explicitly rejected both ITT's jurisdictional argu-ment and its release argument. The judge rejected the release argument because Leveski had only released ITT from claims "based upon" and "relate[d] to her employment," but Leveski's claims in the present FCA suit were "derivative in nature, based on an obligation owed to the Government." (Dkt. 74, 4.) With respect to the jurisdictional argument, the judge noted that 31 U.S.C. § 3730(b)(5) only barred subject-matter jurisdic-tion if Leveski's case could be fairly characterized as a "related action based on the facts underlying" *Graves*. Since Leveski alleged many facts in her complaint that occurred after the *Graves* litigation had been resolved, the judge did not see how Leveski's case could be "based on" *Graves*. Thus, the judge concluded, nothing stood in the way of federal subject-matter jurisdiction over Leveski's case were she to re-file an amended com-plaint alleged with sufficient particularity. (Dkt. 74, 3-4.)

Leveski took up the district judge's offer to amend her complaint, and she filed this amended complaint on October 8, 2009. (Dkt. 75.) ITT immediately filed a second motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b), this time alleging that (1) Leveski had again failed to plead her fraud allegations with sufficient particularity, (2) Leveski had again failed to

state a claim, (3) Leveski's suit was barred by a settlement agreement between ITT and the Department of Education, and (4) at least some of Leveski's claims were barred by the FCA's six-year statute of limitations. (Dkt. 77.) Leveski's case fared much better on the disposition of ITT's second motion to dismiss than it had on the first, with one exception. On May 12, 2010, Judge Lawrence agreed with ITT that the FCA's six-year statute of limitations applied to Leveski's case, thus barring all of Leveski's claims occurring before July 3, 2001 (since Leveski originally filed this action on July 3, 2007). The statute of limitations issue was ITT's only victory, however, as Judge Lawrence rejected the rest of ITT's arguments. After the disposition of ITT's second motion to dismiss, Leveski's case proceeded in the district court covering only the time period from July 3, 2001 to November 3, 2006 instead of the original January 8, 1996 to November 3, 2007 period, and it continues covering this abbreviated time period today since Leveski did not appeal Judge Lawrence's order. Yet practically speaking, this abbreviation does not matter much to Leveski's case since the new time period—July 3, 2001 to November 3, 2006—still covers Leveski's employment both as an RR and as an FAA. (Dkt. 92.)

By the time that Judge Lawrence issued an order on ITT's second motion to dismiss, he had already been dealing with Leveski's case for close to three years. Nonetheless, it appears that because of new judicial appointments to the district court, case assignments were shuffled, and Leveski's case was reassigned from Judge Lawrence's docket to Judge Tanya Walton Pratt's

docket on June 25, 2010. (Dkt. 110.) Perhaps believing that it would have better luck with a new judge, ITT filed a third motion to dismiss Leveski's case on March 16, 2011. (Dkt. 141.) In this third motion, filed pursuant to Fed. R. Civ. P. 12(b)(1), ITT hearkened back to an argument from its first motion to dismiss, claiming once again that the federal court lacked subject-matter jurisdiction over Leveski's case. Instead of basing its jurisdictional argument on 31 U.S.C. § 3730(b)(5), however, ITT now based its jurisdictional argument on the applicable version of 31 U.S.C. § 3730(e)(4):

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

Based on this statute, ITT argued that Leveski's case was "based upon publicly disclosed allegations," and

Leveski was "not the original source of these allegations." (Dkt. 141, 1.) Although based on a different subsection of § 3730, ITT's new jurisdictional argument before Judge Pratt was similar to its earlier jurisdictional argument before Judge Lawrence. Still, ITT now claimed to have stronger evidence that the federal court lacked subject-matter jurisdiction over Leveski's case. (Dkt. 141-1, 6-7.) This stronger evidence came in the form of Leveski's deposition testimony from only two weeks prior, which—according to ITT—"firmly establish[ed that] Leveski lacks direct knowledge of the fundamental premise of her suit . . . and what minimal knowledge she does have was not acquired independently, but through Internet research of prior cases brought against ITT and conversations with the lawyer who recruited her, Matusheski." (Dkt. 141-1, 15.)

Judge Pratt found ITT's jurisdictional arguments more convincing than her predecessor had found them. On August 8, 2011, Judge Pratt dismissed Leveski's case for lack of jurisdiction under 31 U.S.C. § 3730(e)(4), finding that Leveski's allegations had already been publicly disclosed in *Graves* and that Leveski was not the original source of these allegations. Judge Pratt noted that, like Leveski, the *Graves* relators had also been employed by ITT as RRs, and they had also "alleged that ITT violated the HEA by compensating its admissions and recruitment representatives based directly on the number of their enrolled students." (Dkt. 241, 5-6.) Although Leveski had attempted to distinguish her case from *Graves*, the judge did not find her attempts persuasive. The judge acknowledged that Leveski's allegations

against ITT spanned a later time period than the *Graves* allegations. The judge also recognized that Leveski made additional allegations not present in the *Graves* complaint—most notably, the allegation that ITT compensated both FAAs and RRs in a manner that violated the HEA. (In contrast, the *Graves* relators had alleged that ITT only compensated RRs in a manner that violated the HEA.) But citing *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 920-21 (7th Cir. 2011), for the proposition that "though a complaint may add a few allegations not covered by the previous disclosure, it is not enough to take this case outside the jurisdictional bar," the judge ultimately concluded that Leveski's additional allegations were "insufficient to withstand the 'based upon public disclosure' analysis." (Dkt. 241, 6.) Thus, Judge Pratt concluded that 31 U.S.C. § 3730(e)(4)(A) required her to dismiss Leveski's suit for lack of subject-matter jurisdiction. (Dkt. 241.)

Following this dismissal for lack of subject-matter jurisdiction, things went from bad to worse for Leveski. Leveski filed a motion to alter or amend the judgment under Fed. R. Civ. P. 59(e) on September 2, 2011, arguing that the dismissal order had "not take[n] into consideration the material factual differences between this case and . . . *Graves*" and had also ignored binding Seventh Circuit precedent. (Dkt. 255, 2.) A sharp denial ruling referred to Levesi's 59(e) motion as a "second bite at the apple." (Dkt. 297, 15.) The denial did note that "the mechanics of this scheme [alleged by Leveski] are perhaps not identical to the mechanics of the scheme alleged in *Graves*," but emphasized that "the two cases need not be

identical" in order to be barred by 31 U.S.C. § 3730(e)(4)(A). (Dkt. 297, 20.) In response to Leveski's allegation that binding Seventh Circuit precedent had not been followed, the denial ruling noted that "the Court's decision to grant ITT's motion to dismiss was not an anomaly. To the contrary other courts have dismissed nearly identical *qui tam* suits where the plaintiff's attorney [Matusheski] clearly recruited the relators to serve as makeshift and manufactured whistleblowers wielding generic and cookie-cutter complaints." (Dkt 297, 20.) Along those lines, the order concluded with a stern criticism of the way in which attorney Matusheski had recruited Leveski to bring her case. Noting that Matusheski had recently apologized to another federal district court for his behavior in a separate FCA case involving a different for-profit educational institution, the district judge characterized Matusheski's continual pursuit of Leveski's case as "brazen." (Dkt 297, 20.) Leveski, according to the district judge, was "worlds apart from the type of genuine whistleblower contemplated by the FCA," leading the judge to conclude that both "the existence of nearly on-point cases reaching identical results [and] the attorney-driven nature of this lawsuit" demanded the dismissal of Leveski's suit for lack of subject-matter jurisdiction under 31 U.S.C. § 3730(e)(4)(A). (Dkt. 297, 21.)

The final blow to Leveski's lawsuit came in the form of sanctions. ITT had sought sanctions in the district court against both Leveski and her counsel, principally contending that the *qui tam* suit was frivolous. Upon the dismissal of Leveski's case for lack of subject-

matter jurisdiction, the district judge awarded sanctions against counsel only. (Note that in addition to Matusheski, Leveski had secured additional counsel by the time that the district court dismissed her case and granted sanctions. The law firm of Plews Shadley Racher & Braun had joined Matusheski in the representation of Leveski on April 30, 2009, and the law firm of Motley Rice LLP had joined both Matusheski and Plews Shadley in the representation of Leveski on June 2, 2011. Despite their differing lengths of involvement with Leveski's case, all counsel were included in the sanctions order.) Nevertheless, because we now reverse the dismissal, this sanctions order will require little discussion.

Leveski and her counsel filed a timely appeal of both the dismissal and the sanctions order with our court. We review Leveski's appeal concerning the district court's dismissal of her case for lack of subject-matter jurisdiction *de novo*. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). Furthermore, because ITT raised a factual (instead of a facial) challenge to jurisdiction, we are "not bound to accept as true the allegations of the complaint which tend to establish jurisdiction." *Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir. 1979). Instead, we may "properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue"—such as Leveski's deposition testimony. *Id.*; *see also Hay v. Ind. State Bd. of Tax Comm'rs*, 312 F.3d 876, 879 (7th Cir. 2002).

II

Both Leveski and ITT agree that federal subject-matter jurisdiction over this case turns on our interpretation of 31 U.S.C. § 3730(e)(4). The version of § 3730(e)(4) applicable to Leveski's lawsuit is the version that was "in force when the events underlying this suit took place." *United States ex rel. Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933, 934 (7th Cir. 2012) (noting that the language of § 3730(e)(4) was "altered in 2010, but that change is not retroactive"). This version of § 3730(e)(4), which remained effective from October 27, 1986 until March 22, 2010—a time period that encompasses both Leveski's employment at ITT and her subsequent filing of this lawsuit—bars federal court "jurisdiction over an [FCA] action . . . based upon the public disclosure of allegations . . . unless . . . the person bringing the action is an original source of the information." Pub. L. No. 99-562, § 3, 100 Stat. 3153 (1986). Congress added this provision to the FCA in order to avoid the "risk that unnecessary 'me too' private litigation would divert funds from the Treasury." *Goldberg*, 680 F.3d at 934. With this congressional purpose in mind, we have previously interpreted the phrase "based upon [a] public disclosure" to mean "substantially similar to publicly disclosed allegations," in accordance with virtually every other circuit that has interpreted this phrase.[1] *Glaser*, 570

---

[1] The current version of 31 U.S.C. § 3730(e)(4), which went into effect on March 23, 2010, expressly incorporates the "substan-

(continued...)

F.3d at 920. Moreover, the applicable version of § 3730(e)(4)(B) defines the term "original source" to mean "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an [FCA] action."

Applying the definitions of these terms to the instant case, we must first determine whether Leveski's allegations are "substantially similar to publicly disclosed allegations." 570 F.3d at 920. If we decide that Leveski's allegations are not substantially similar, then our jurisdictional inquiry ends, and Leveski can proceed to litigate her case on the merits in the federal district court. On the other hand, if we decide that Leveski's allegations are substantially similar, then our jurisdictional inquiry has a second step. In this second step, we must assess whether Leveski has "direct and independent knowledge of the information on which [her] allegations are based." 31 U.S.C. § 3730(e)(4)(B). (Both sides agree that Leveski contacted the government before bringing this action, so we need not inquire whether Leveski "voluntarily provided [her] information to the Government before filing.") (Dkt. 334-3, 4.) If

---

[1] (...continued)
tially similar" standard previously used by our circuit and most other circuits under the prior version of the statute. *See* 31 U.S.C. § 3730(e)(4)(A) (2013) (commanding courts to "dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed."

we decide that Leveski has direct and independent knowledge of her allegations, then once again, Leveski can proceed to litigate her case on the merits in the federal district court. If we decide that Leveski does not have direct and independent knowledge, however, then 31 U.S.C. § 3730(e)(4)(A) bars subject-matter jurisdiction, and Leveski cannot litigate her case in federal court.

## A

The first step of our jurisdictional inquiry requires us to determine whether Leveski's allegations are substantially similar to the relators' allegations in *Graves*, 284 F. Supp. 2d at 490-93, which was filed more than five years before Leveski's case on April 22, 2002. (Dkt. 241.) Although we have already reviewed Leveski's allegations in Section I, we must also review the *Graves* allegations before making this determination. We turn to this review now. Much like the present case, the *Graves* case was brought by relators who were former employees of ITT. The two relators, Susan Newman and Dan Graves, had worked for ITT as Inside RRs—the same job that Leveski had once held at ITT. Moreover, the two *Graves* relators alleged in their complaint that ITT had violated the HEA by illegally paying incentive compensation to its RRs. (Dkt. 241, 6.)

Certainly, the allegations in *Graves* seem very similar to Leveski's allegations on first impression. But first impressions can be deceiving. A closer examination reveals four critical differences between the two cases. First, we note that the relators in *Graves* had much

shorter tenures at ITT than did Leveski. Relator Susan Newman was employed by ITT for approximately nineteen months (from June 2, 1998 to February 7, 2000), while relator Dan Graves was employed for less than one year (from July 1999 to February 2000). (Dkt. 141-9, 3.) Leveski, in contrast, worked for ITT for over a decade (January 8, 1996—November 3, 2006). (Dkt. 75.) The relatively long span of Leveski's employment, of course, does not directly impact her FCA claim. Nevertheless, because Leveski worked at ITT for so much longer than the *Graves* relators, she has greater potential than the *Graves* relators to possess relevant evidence about ITT's compensation scheme that could directly impact her FCA claim.

Second, and relatedly, the long span of Leveski's employment allows her to make allegations against ITT that cover a different time period than the *Graves* allegations. Although the *Graves* relators worked for ITT for less than two years, they allege that "ITT paid illegal incentive compensation to its admissions representatives" from "1993 to 1999"—i.e. during the five years prior to their being hired by ITT as well as during their brief employment. (Dkt. 141-9, 24-25.) Leveski, on the other hand, alleges that ITT paid illegal incentive compensation throughout her decade-long employment at ITT from 1996 to 2006. After excluding the earlier years of Leveski's employment (since Judge Lawrence found allegations from these years barred by the six-year statute of limitations), Leveski's allegations cover the period from July 3, 2001 to November 3, 2006. (Dkt. 92.) Thus, there is no temporal overlap between the *Graves* allegations and Leveski's allegations.

Third, because the *Graves* relators were employed by ITT for a relatively short period of time, they were only able to make allegations about the one department to which they were briefly exposed: the recruitment office. Leveski, on the other hand, is able to present evidence about ITT practices in a second department, the financial aid office, since her long employment afforded her the opportunity to hold two different positions (RR and FAA). Indeed, Leveski's experience as an FAA during the latter half of her employment at ITT allows her to make allegations both about the way that ITT compensated its employees in the financial aid office and about the way that ITT applied to the federal government for financial aid. Specifically, Leveski alleges that the FAAs' salaries "were directly tied" to how much financial aid they could secure for ITT "by the first available date permitted by Federal law." (Dkt. 75, 13-14.) With regard to ITT's applications for federal financial aid, Leveski testified in her deposition that other ITT employees, and even her manager, condoned students underreporting their income on the FAFSA (which would, of course, increase the amount of financial aid for which they were eligible). (Dkt. 141-6, 151-53). If true, both of Leveski's allegations would constitute clear violations of the HEA—and yet, these allegations are wholly absent from the *Graves* case.

Fourth, even putting aside Leveski's additional allegations about the ITT financial aid office, we see significant differences in her allegations about the recruitment office. The scheme alleged by the *Graves* relators

involved a flagrant violation of Department of Education requirements. According to them,

> ITT's salary administration program for admissions and recruitment personnel provided in part for the payment of "5% of earned revenues for Inside Representatives and 10% of earned revenues for Outside Representatives." The level of "earned revenue" was a direct function of the new and continuing students and graduates who are enrolled by the admissions and recruitment representative.

(Dkt. 141-9, 24.) In addition to this allegation that ITT paid direct commissions to its RRs, the *Graves* relators alleged that ITT "had minimum enrollment quotas for recruiters. Recruiters failing to meet their enrollment quotas were fired. Each campus had a minimum enrollment quota that was determined by ITT's officers and directors as part of the annual budgeting process." Brief of Petitioner-Appellant at 6, *United States ex rel. Graves v. ITT Educ. Servs.*, No. 03-20460 (5th Cir. Nov. 4, 2003). The scheme alleged by Leveski, in contrast, involves a much more sophisticated—and more difficult to detect—violation of Department of Education requirements. Leveski does not allege that either her compensation or her continuation as an ITT employee depended on explicit percentages or quotas. In fact, she acknowledges that ITT claimed to compensate her based on a wide range of factors (including appearance, attitude, and participation in continuing education classes). But Leveski alleges that how ITT claimed to compensate her and

how ITT actually compensated her were very different. Despite ITT's claims, Leveski believes that her compensation was based on only one thing: the number of students Leveski brought into ITT (and as a result, the amount of money Leveski brought into ITT).

Moreover, through her affidavit and deposition testimony, Leveski provides evidence to support her allegations that ITT's claimed practices in its recruitment and financial aid offices did not match ITT's actual practices. As the excerpts from Leveski's testimony in Section I demonstrated, Leveski was able to name specific individuals in positions of authority at ITT who told her that her recruitment and financial aid "numbers" were all that mattered. Leveski also provided evidence that ITT never considered any other factors besides her numbers. For example, Leveski indicated that ITT did not police what types of continuing education classes that its employees took, even though the employees were allegedly evaluated on these classes. As a result, ITT employees who "got a master's degree in education" appeared to get the same amount of "professional development" credit as employees who "took something at [their] church." (Dkt. 141-6, 87.) Furthermore, although ITT employees were allegedly evaluated on their appearance, ITT's evaluation of appearance did not correlate with how the employee actually appeared. Leveski testified that she "wore the same suits the first day [she] started to work at ITT and the last day [she] left ITT." (Dkt. 141-6, 88.) Yet she only received an excellent appearance evaluation during her first year at ITT—coincidentally, the same year that her recruitment "num-

bers" were also "exceptional." (Dkt. 141-6, 88.) Leveski's testimony suggests that ITT's supposed multi-factor evaluation system was little more than a sham.

Undoubtedly, the sham compensation scheme and the financial aid violations alleged by Leveski are different than the outright quota system alleged by the *Graves* relators. But the question we must face is whether Leveski's allegations are different enough from the *Graves* allegations to bring her suit outside the public disclosure bar of 31 U.S.C. § 3730(e)(4). A review of our recent case law leads us to the conclusion that they are different enough. Indeed, Leveski's allegations against ITT are only similar to the *Graves* allegations when viewed at the highest level of generality. But in the last few years, we have indicated on more than one occasion that viewing FCA claims "at the highest level of generality . . . in order to wipe out *qui tam* suits that rest on genuinely new and material information is not sound." *Goldberg*, 680 F.3d at 936.

For instance, in *United States ex rel. Baltazar v. Warden*, 635 F.3d 866, 869-70 (7th Cir. 2011), we reversed a dismissal under the § 3730(e)(4) jurisdictional bar after we found that the district court had viewed the relator's claims too generally. There, chiropractor Kelly Baltazar brought an FCA claim against the chiropractic group for which she had previously worked, alleging that the group had "added to her billing slips services that had not been rendered and [upcoded] for services that had been performed." *Id*. at 866. Prior to Baltazar's suit, the General Accounting Office (GAO) had issued

several reports detailing widespread, abusive Medicare billing practices by chiropractic groups—without naming specific groups that were guilty of these abusive practices. Nevertheless, the district judge believed that these reports were enough to preclude federal court jurisdiction over Baltazar's claim. On appeal, we pointed out that Baltazar's suit was "'based on' her own knowledge rather than the published reports" and had "supplied vital facts that were not in the public domain." *Id*. at 869. Because the GAO reports did "not disclose the allegations or transactions on which Baltzar's [suit was] . . . based," we found that § 3730(e)(4) did not stand in the way of Baltazar's suit. *Id*. at 868. Like Baltazar's allegations, Leveski's allegations are clearly based on her own knowledge; in her affidavit and deposition, she provides the court with relevant names, meetings, and other details specific to her employment with ITT. And like Baltazar, Leveski has supplied the court with vital facts that were not alleged in *Graves*. Leveski has suggested that ITT developed a sophisticated, yet illegal employee evaluation and compensation scheme designed to avoid detection by the Department of Education.

As helpful as the *Baltazar* decision is to Leveski, even more helpful to her is our decision last year in *Goldberg*, 680 F.3d at 936. There again, we reversed a district court that had dismissed an FCA suit for lack of jurisdiction under § 3730(e)(4) after viewing the relator's claims too generally. *Id*. The relators in *Goldberg* were an orthopedic surgeon and a director of real estate at Rush University Medical Center in Chicago. Together, they alleged

that Rush was improperly billing Medicare for services performed by teaching physicians that were, in reality, performed by inadequately supervised residents. *Id*. at 934-35. During the 1990s, both the Department of Health and Human Services and the GAO had issued research studies concluding that improper billing for services performed by unsupervised residents was a widespread problem in teaching hospitals nationwide. *Id*. at 934. Much like Leveski, however, the relators in *Goldberg* alleged a more sophisticated, harder to detect scheme than the kind described in the governmental reports. The reports had accused teaching hospitals of billing for services performed by residents who were wholly unsupervised. The *Goldberg* relators, on the other hand, alleged that Rush billed for services performed by residents who were not *adequately* supervised. According to them, Rush scheduled teaching physicians for multiple surgeries at once, such that "even if the teaching physician were present for the 'critical' portion of one [surgery], . . . the surgeon could not have been 'immediately available for the rest of each procedure," as required by Medicare. *Id*. at 935. After reviewing the relators' allegations, we found that they had "allege[d] a kind of deceit that the GAO report does not attribute to any teaching hospital. Unless we understand the 'unsupervised services' conclusion of the [governmental reports] at the highest level of generality—as covering all ways that supervision could be missing or inadequate—the allegations of these relators are not 'substantially similar.' " *Id*. at 936. Thus, we found that § 3730(e)(4) did not destroy federal court jurisdiction over the relators' claims. *Id*.

Like *Goldberg* and *Baltazar*, we believe that Leveski's case is yet another instance of a district court dismissing an FCA suit after viewing the allegations at too high a level of generality. To be sure, Leveski's case looks similar to the *Graves* case at first blush. The relators in both cases are former employees of ITT—and even held the same job title. The relators in both cases also allege that ITT violated the incentive compensation provision of the HEA. But this is where the similarities between the two cases end. The details of how ITT allegedly violated the HEA are quite different in Leveski's case than they were in *Graves*. Unlike the *Graves* relators, who alleged a more rudimentary scheme by ITT to violate the HEA incentive compensation provision, Leveski alleges a more sophisticated, second-generation method of violating the HEA.

Furthermore, although we know from Leveski's deposition testimony that she reviewed the *Graves* case before filing her lawsuit, we are convinced that Leveski has done more than just "add[] a few allegations" to the *Graves* complaint. *Glaser*, 570 F.3d at 920. In *Glaser*, we upheld a district court's dismissal for lack of jurisdiction under § 3730(e)(4) after finding that a relator had done just that—characterizing the *Glaser* relator's allegations as "wrongdoing [that was] virtually identical" to prior, publicly disclosed allegations. *Id*. The relator, Carol A. Glaser, brought an FCA suit accusing a medical clinic of fraudulent billing practices; but this time, the relator was a patient, not an employee, of the medical clinic. Unlike Leveski, Glaser had no inside information from her own personal experience at the clinic; instead, she

appeared to have learned *all* of the relevant information in her FCA complaint from her attorney. *Id*. at 921. Moreover, Glaser's allegations covered the same time period covered by an ongoing Centers for Medicare and Medicaid Services (CMS) investigation of the clinic. *Id*. at 909. The CMS investigation centered on whether the defendant medical clinic had billed patients for seeing a doctor when they had actually seen a physician's assistant. Glaser alleged exactly the same fraudulent billing practices in her complaint. Indeed, Glaser's only unique contribution was pointing out a couple of instances in which the clinic billed patients for seeing a doctor (instead of the physician's assistant whom they had actually seen) that were not mentioned in the CMS report. It was under these circumstances we held that "add[ing] a few allegations . . . is not enough to take [a] case outside the jurisdictional bar, properly understood; 'based upon' does not mean 'solely based upon.'" *Id*. at 920.

In contrast to Glaser, Leveski has used inside information that she obtained during her decade-long employment to make allegations that are noticeably different from any prior allegations against ITT. Leveski's case would be more analogous to *Glaser* if Leveski had merely added a few examples from her own personal experience at ITT to the *Graves* complaint, re-alleging that ITT maintained minimum enrollment quotas for its recruiters and paid its recruiters direct commissions. But Leveski has done much more than re-package the *Graves* complaint. She has alleged new tactics by ITT to avoid the mandates of the HEA—tactics that extend

beyond the recruiting office (the focus of *Graves*) to the financial aid office.

The extent to which Leveski's complaint goes beyond a mere re-packaging is perhaps most apparent when viewed in light of two other recent FCA cases that were unsuccessfully litigated by her attorney, Timothy Matusheski. Matusheski, who bills himself as the "Mississippi Whistle Blower," has apparently recruited many other FCA relators besides Leveski to pursue HEA-related cases against for-profit educational institutions. *The Law Offices of Timothy J. Matusheski*, *available at* http://mississippiwhistleblower.com (last visited July 1, 2013). For at least two of these cases, Matusheski appears to have recruited relators who possessed little to no knowledge beyond what was already in the public domain.

In *United States ex rel. Lopez v. Strayer Educ., Inc.*, 698 F. Supp. 2d 633 (E.D. Va. 2010), the relator recruited by Matusheski, Magdalis Lopez, was a former recruiter for Strayer University who alleged that Strayer paid its recruiters incentive compensation in violation of the HEA. Like the *Graves* relators, Lopez only alleged violations in the recruiting office (not the financial aid office), and Lopez appeared to allege a more straightforward scheme of outright recruitment commissions and bonuses. Nevertheless, the exact details of Lopez's alleged scheme were never clear due to her total inability to produce any evidence of specific people, statements, and incidents to support her allegations. For instance, when asked at her deposition to explain certain allega-

tions in her complaint, Lopez could not provide any details:

> Q. Do you have any factual knowledge of any of the statements in your complaints from paragraphs 43 through 72?
>
> A. I have knowledge.
>
> Q. What knowledge? Point to—me to one factual statement that you knew before talking to [Matusheski].
>
> A. (after objection by counsel) I'm not an attorney. You know, I cannot give you, you know, like, details.

*Lopez*, 698 F. Supp. 2d at 639. Lopez's inability to provide relevant details in her deposition testimony stands in sharp contrast Leveski's ability to name specific people and describe specific incidents in her deposition testimony, as recounted in Section I.

Similarly, in *United States ex rel. Schultz v. DeVry Inc.*, No. 07 C 5425, 2009 WL 562286 (N.D. Ill. Mar. 4, 2009), the relator recruited by Matusheski, Jennifer S. Schultz, was also a former recruiter—but this time, for DeVry University—who alleged that DeVry paid its recruiters incentive compensation in violation of the HEA. Like Lopez, Schultz only alleged violations in the recruiting office, and Schultz alleged a straightforward bonus incentive compensation system for recruiters that violated the HEA. And just like Lopez, Schultz was completely incapable of providing any relevant details in her deposition testimony. During Schultz's deposition, she refused

to answer any questions about what information Matusheski had provided her, and what information she had provided Matusheski, citing the attorney-client privilege. *Id.* at *1, *4. Leveski, in contrast, was much more candid about the information that Matusheski had provided her, and the information she had provided him. (Dkt. 141-6, 239-44.) More importantly, the specific names and incidents that Leveski provided though her deposition testimony and her affidavit are details specific to Leveski's employment—details that Matusheski was incapable of supplying to Leveski.

It is true that serious questions have been publicly raised about whether some for-profit educational institutions have violated the incentive compensation provisions of the HEA. *See, e.g.*, Editorial, *An Industry in Need of Accountability*, N.Y. Times, Aug. 15, 2011, at A20. The fact that Matusheski alone has litigated multiple FCA lawsuits against for-profit educational institutions demonstrates that this general knowledge is well within the public domain. But Leveski has added new facts and new details to this general knowledge that were not previously in the public domain. Even though prior relators represented by Matusheski, such as Lopez and Schultz, were not able to add new facts and new details, Leveski is different. Through her deposition testimony and her affidavit, Leveski has informed the public about a new method of violating the HEA prohibition against incentive compensation—a method much more difficult to detect than outright commission and bonus schemes. Leveski has also informed the public that HEA violations in for-profit educational institutions may extend

beyond recruiting departments and bleed into financial aid departments. And Leveski's allegations do not appear to be baseless; as the excerpts from Leveski's deposition and affidavit in Section I demonstrate, she has recounted specific conversations with specific individuals that support her allegations.

In closing our discussion of why Leveski's allegations are not "based upon" *Graves* for the purposes of 31 U.S.C. § 3730(e)(4)(A), we pause to emphasize two important points. First, we have not ignored ITT's argument that Leveski has altered her allegations on appeal in order to distinguish them from the *Graves* allegations. But we have saved our discussion of this argument to the end because we think it lacks merit. Accusing Leveski of "brief[ing] a different case from the one Leveski actually filed," ITT asserts that Leveski did not emphasize the allegations that most convincingly distinguish her case from *Graves* in the district court. ITT argues that Leveski did not emphasize that ITT "created a matrix to feign compliance" with the HEA even though it "was still illegally compensating student recruiters" in her second amended complaint (the controlling complaint in this case). Yet we had no trouble finding this allegation in paragraph thirty-two of the second amended complaint:

> While continually reminding sales representatives to meet sales targets to obtain raises and stay employed, ITT corporate employees and Troy campus directors never discussed tactics to meet non-sales targets that were included in sales

> representatives' yearly review such as assisting the school in meeting its attrition budget, being a team player, appearance, and attitude.

(Dkt. 75, 12.) Similarly, ITT accuses Leveski of not previously emphasizing her allegations that ITT's illegal compensation scheme extended beyond the recruiting office to the financial aid office. But again, we had no trouble finding this allegation in paragraph thirty-eight of Leveski's second amended complaint: "Relator's and other financial aid administrators' salary increases were directly tied to financial aid: rising and falling based on whether the representative exceeded or failed to meet financial aid goals." (Dkt. 75, 14.) Perhaps ITT's most puzzling argument, however, is that Leveski has somehow waived the right to distinguish her case from *Graves* because she failed to mention *Graves* in her second amended complaint. But Leveski had no reason to mention *Graves* in her second amended complaint. Her allegations had nothing to do with the *Graves* case. Her allegations were based upon her own personal experience at ITT, not the allegations of the *Graves* relators. *Graves* only became an issue in Leveski's case once ITT brought it to the district court's attention in its final motion to dismiss for lack of subject-matter jurisdiction. (Dkt. 143.) As soon as ITT raised *Graves*, Leveski immediately responded. In her brief opposing ITT's final motion to dismiss for lack of subject-matter jurisdiction, Leveski pointed out to the district court that her "complaint allege[d] different misconduct during a different time period than *Graves*" and that "*Graves* d[id] not address financial aid advisors." (Dkt. 154, 12.) In sum,

ITT has failed to produce any convincing evidence that Leveski has altered her allegations on appeal.

Second, although we believe that Leveski has evidence to support her allegations, we do not necessarily imply that Leveski has a winning case. As we have noted before, "[r]elators' allegations may be incorrect . . . [b]ut these are questions on the merits." *Goldberg*, 680 F.3d at 936. In other words, we believe that Leveski could have a winning case, but ultimately, it is up to her to convince a trier of fact that her allegations are true. For now, we only evaluate whether the federal district court has subject-matter jurisdiction under 31 U.S.C. § 3730(e)(4)(A) to let Leveski's case proceed. All we care about at this stage is whether Leveski's allegations "rest on genuinely new and material information." *Id*. We find that Leveski's case does rest on genuinely new and material information, and as a result, Leveski's allegations are not "substantially similar to publicly disclosed allegations." *Glaser*, 570 F.3d at 920. Leveski's case is not "based upon" the prior *Graves* allegations, and so the federal district court has subject-matter jurisdiction over her case under § 3730(e)(4)(A).

**B**

Because we find that Leveski's allegations are not "based upon the public disclosure of allegations" under 31 U.S.C. § 3730(e)(4)(A), our jurisdictional inquiry need not go any further. Nevertheless, we pause here to note that even if we had found that Leveski's allegations were based on a prior public disclosure, Leveski

would still be allowed to proceed as an "original source" of her information. 31 U.S.C. § 3730(e)(4)(A). Recall that Leveski may litigate her case on the merits—even if her allegations are based upon a prior public disclosure—as long as she has "direct and independent knowledge of the information on which [her] allegations are based." 31 U.S.C. § 3730(e)(4)(B).

In evaluating whether Leveski is an "original source" of her claims, we find our language in *Baltazar*, 635 F.3d at 869, particularly enlightening: "The question is whether the relator is an original source of the allegations in the complaint and not, as the district court supposed, whether the relator is the source of the information in the published reports." Thus, it is not appropriate to ask whether Leveski was the original source of the allegations in *Graves*. Nor is it appropriate to ask whether Leveski was the first person to bring HEA violations by for-profit educational institutions to the public's attention. Rather, it is appropriate to ask whether Leveski is the original source of the specific allegations in her complaint.

For the same reasons that we found that Leveski's allegations are not "based upon" a prior public disclosure under § 3730(e)(4)(A), we also find that she has direct and independent knowledge of her allegations, and thus, is the original source of them. In *Glaser*, 570 F.3d at 921, we indicated that a relator's knowledge was not "direct" if the relator "had *no knowledge whatsoever* of the fraudulent conduct before hearing from an attorney." We further indicated that a relator's knowledge was not

"independent" if the relator would not "'have learned of the allegation or transactions independently of the public disclosure.'" *Id*. (quoting *United States v. Bank of Farmington*, 166 F.3d 853, 865 (7th Cir. 1999)).

Along these lines, ITT argues that Leveski's knowledge of the RR and FAA compensation schemes was neither direct nor independent since Leveski admitted at her deposition that she had not considered filing an FCA suit until attorney Matusheski contacted her. Dkt. 141-6, 244. Yet just because Leveski had never considered filing suit until an attorney contacted her does not necessarily mean that she lacked sufficient knowledge to bring suit. It could simply mean that Leveski did not know her rights under the law. And that appears to be the case here—although we know that Leveski reviewed prior FCA complaints against ITT after speaking with Matusheski, including *Graves*, 284 F. Supp. 2d 487, and *Olson*, 2006 WL 64597, Leveski has provided the court with many pieces of evidence that could have only come from her. As detailed in Section I, Leveski has recalled specific conversations with her personal supervisors that indicate ITT was in violation of the HEA throughout the course of Leveski's decade-long employment. Matusheski could not have fed this evidence to Leveski. Matusheski never worked for the Troy, Michigan campus of ITT—he lives at the other end of the country in Mississippi—so he would have no way of knowing what occurred on that specific campus. Nor could the *Graves* complaint have fed this evidence to Leveski. The *Graves* complaint is extremely general, providing absolutely no details about how either relator

surmised through their employment that ITT might be in violation of the HEA. Ironically, the allegations contained within the *Graves* complaint read like something that came from an attorney, and not the relators themselves. (Dkt. 141-9.)

In contrast, virtually all of Leveski's evidence in support of her allegations against ITT comes from conversations to which she was a party. For instance, in her deposition, Leveski makes some references to information she learned from other ITT employees, but for the most part, Leveski discusses *statements that were made directly to her by her supervisors at ITT*. Leveski's main evidence is personal and specific to her; it is not second- or third-hand evidence learned from another source like an attorney, a co-worker, or a prior lawsuit. Therefore, we find that Leveski's evidence is based on her own direct and independent knowledge. Because the most compelling evidence against ITT could have only come from Leveski herself, we are not troubled by Leveski's admission that she had not contemplated filing suit until Matusheski contacted her. Attorneys are allowed to advise potential future clients of both the contents of the law and their rights under the law; it is upon that basis that attorneys are permitted to advertise their services. *See Bates v. State Bar of Ariz.*, 433 U.S. 350, 376 (1977) (noting that advertising allows a "supplier [attorney] to inform a potential purchaser [client] of the availability and terms of exchange"). After all, "potential clients rarely know in advance what services they do in fact need," and in some cases, potential clients do not know that they need any services from an attorney. *Id*. at 386

(Burger, C.J., concurring in part and dissenting in part). Here, Leveski had no idea that she was sitting on information that was potentially valuable to the government until Matusheski contacted her. The fact that Leveski first learned the potential value of her information from Matusheski does not bar her claim.[2]

Moreover, just because a party first learns that she may have a valuable legal claim from an attorney seeking her business does not mean that the party's case is bogus. Leveski's counsel drew an analogy at oral argument between the events underlying Leveski's decision to file her FCA suit and the events underlying the defendants' decision in the famous case, *Lawrence v. Texas*, 539 U.S. 558 (2003), to pursue their appeal all the way to the Supreme Court. According to a recent book by University of Minnesota law professor Dale Carpenter, the *Lawrence* defendants would never have appealed the constitutionality of their sodomy convictions on their own. *See Flagrant Conduct: The Story of Lawrence v. Texas* 132 (W. W. Norton & Co. 2012) (noting that neither of the *Lawrence* defendants had the "'fire in the belly' reaction [to their arrest] of activists ready to take on the legal system"). Instead, the "legal trajectory" of *Lawrence* was the result of gay activists learning of the

---

[2] Because ITT makes much of Matusheski's "track record of improper behavior" in its brief, we specifically asked ITT at oral argument what rule of professional conduct that Matusheski's "recruitment" of Leveski violated. ITT could not supply us with a single rule.

defendants' arrest and subsequently putting the defendants in touch with a lesbian, gay, bisexual, and transgender legal defense organization. *Id*. at 118. Without the encouragement of attorneys from this organization, the defendants never would have known their rights. They would have never known that they had a strong constitutional challenge to the Texas sodomy law, and thus, would never have pursued an appeal. *Id*. at 117-32. Leveski contends that she is in the same position: without the encouragement of attorney Matusheski, she would have never known her rights. This analogy is interesting, but unnecessary. The annals of legal history are full of examples of lawyers playing a vital role in encouraging parties to litigate. If done in a proper manner—that is, within the confines of the applicable rules of professional conduct—there is nothing about such attorney involvement that negates the validity of a suit. As applied to the case at hand, ITT has not shown that Matusheski's conduct invalidates Leveski's claim.

Although we find ITT's argument regarding Matusheski's role in this suit unpersuasive, ITT raises a second argument challenging the directness and independence of Leveski's knowledge. Leveski, ITT points out, was never in a position of authority during her employment; she was never responsible for setting employee compensation or filing PPAs. As a result, ITT argues that Leveski lacks "sufficient knowledge of ITT's allegedly illegal compensation practices." In response to this argument, we note that we have never required a relator to have previously occupied a position of author-

ity, and in fact, we have previously found relators who were even greater outsiders than Leveski to possess direct and independent knowledge of their FCA claims.

For instance, in *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013 (7th Cir. 1999), the relator, Allen Lamers, owned a private bus company that had once contracted with the city of Green Bay to bus school children. After it lost the contract, the owner filed an FCA suit alleging that the city of Green Bay had fraudulently represented to the Federal Transit Administration (FTA) that it was in compliance with FTA regulations in exchange for FTA funding. Lamers had never even worked for the city of Green Bay—let alone witnessed or participated in the city's filing of compliance forms. Yet still we found that Lamers's FCA suit had adequate subject-matter jurisdiction because he had direct and independent knowledge derived from "walk[ing] the streets of Green Bay observing the buses in action." *Id*. at 1017. Lamers had spent time observing the Green Bay buses, and his observations called into question whether Green Bay was in compliance with FTA regulations. It was unnecessary for Lamers to prove personal knowledge that Green Bay had fraudulently certified its compliance with FTA regulations at the outset of his suit. Clearly, Green Bay was certifying that it was in compliance since it was still receiving FTA funding—which meant that if Lamers's allegations were true, Green Bay was *falsely* certifying it was in compliance.

A decade after *Lamers*, we reaffirmed that a relator need not produce a copy of the actual document

making the false claim at the outset of the lawsuit in *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009). There, Curtis J. Lusby, a former Rolls-Royce engineer, brought an FCA suit claiming that the company was falsely certifying that the engines it built for the Air Force conformed to military specifications. *Id*. at 850. In response, Rolls-Royce argued that as an engineer, Lusby had not seen "any of the invoices and representations that Rolls-Royce submitted to its customers. He kn[ew] about shipments and payments, but he d[id] not have access to the paperwork." *Id*. at 854. Although Lusby admitted that he had not had access to the paperwork, he countered that "Rolls-Royce *must* have submitted at least one such certificate [of compliance], or the military services would not have paid for the goods." *Id*. We agreed with Lusby, holding:

> We don't think it essential for the relator to produce the invoices (and accompanying representations) at the outset of the suit. True, it is essential to show a false statement. But much knowledge is inferential—people are convicted beyond a reasonable doubt of conspiracy without a written contract to commit a future crime—and the inference that Lusby proposes is a plausible one.

*Id*. Moreover, we noted that "[s]ince a relator is unlikely to have those documents unless he works in the defendant's accounting department," holding otherwise would have "take[n] a big bite out of *qui tam* litigation." *Id*.

Both *Lamers* and *Lusby* stand for the proposition that Leveski need not produce copies of the PPAs in which

ITT certified compliance with the HEA at the outset of her lawsuit. For now, an inference is enough. Leveski observed ITT receive federal funding throughout her employment, and ITT could only have received federal funding by certifying compliance with the HEA. Consequently, if Leveski's allegations about incentive compensation are true, then ITT must have been *falsely* certifying compliance with the HEA. Furthermore, our holding in *Lamers* completely refutes ITT's contention that Leveski needed to be in a position of authority or responsible for setting the compensation of other employees at ITT in order to have direct and independent knowledge of her FCA claim. Recall that relator Lamers never worked for the city of Green Bay before filing an FCA suit against it, and yet we found that he had sufficiently direct and independent knowledge based on his personal observations as a total outsider. 168 F.3d at 1017. If Lamers's observations as a total outsider from the defendant were sufficient to constitute "direct and independent knowledge of the information on which the allegations were based," then certainly Leveski's observations as a ten-year employee of the defendant company are sufficient. 31 U.S.C. § 3730(e)(4)(B).

## III

Given our finding that Leveski's allegations are sufficiently distinguishable from *Graves*—not to mention our finding that she has direct and independent knowledge of her allegations—our sanctions analysis becomes quite easy. The district judge sanctioned Matusheski personally

under 28 U.S.C. § 1927 and sanctioned the Law Offices of Timothy J. Matusheski, Plews Shadley, and Motley Rice under Fed. R. Civ. P. 11. Although these sanctions were granted under two different rules, they were all granted for the same reason: the district judge concluded that Leveski's counsel had continued to pursue a "frivolous" case despite "unmistakably clear warnings that [they were] playing with fire by pushing the case forward." (Dkt. 318, 23.)

As indicated above, we disagree with this conclusion. Our lengthy discussion of Leveski's case has shown that Leveski's case appears to be substantial, not frivolous. Even disregarding the fact that Leveski's allegations cover a later time period than the *Graves* allegations, Leveski has still provided the district court with at least two ways in which her allegations substantially differ from the *Graves* allegations: (1) *Graves* alleged an outright scheme to violate the HEA incentive compensation ban, in which ITT did not even attempt to feign compliance, and (2) *Graves* was solely concerned with the ITT recruitment office and had nothing to say about the ITT financial aid office. Moreover, through her affidavit and deposition testimony, Leveski has provided the district court with numerous pieces of evidence both supporting her allegations and demonstrating that her knowledge is direct and independent.

At this stage of the litigation, we think that Leveski has produced more than enough to overcome the 31 U.S.C. § 3730(e)(4) jurisdictional bar. We do not know whether Leveski will ultimately prevail, nor do we

state any opinion as to whether Leveski *should* ultimately prevail. But we do believe that Leveski should be allowed to litigate her case on the merits, and thus, sanctions for bringing a frivolous lawsuit are inappropriate.

Of course, if it becomes clear later in the course of litigation that Leveski has made up all of her allegations and all of her supporting evidence, then sanctions may be warranted. But for now, the truth of Leveski's allegations is not appropriately resolved on a motion to dismiss for lack of subject-matter jurisdiction. Leveski has presented enough to move forward with this litigation. Consequently, we REVERSE both the district court's dismissal of Leveski's case for lack of subject-matter jurisdiction and the district court's award of sanctions in the amount of $394,998.33 against Leveski's counsel, and we REMAND the case back to the district court for further proceedings consistent with this opinion. Circuit Rule 36 will apply on remand.